JOHN WALSHE MURRAY (074823)
ROBERT A. FRANKLIN (091653)
JENNY LYNN FOUNTAIN (226241)
MURRAY & MURRAY
A Professional Corporation
19400 Stevens Creek Blvd., Suite 200
Cupertino, CA 95014-2548
Telephone: (650) 852-9000; (408) 907-9200
Facsimile: (650) 852-9244
Email: jwmurray@murraylaw.com
Email: rfranklin@murraylaw.com
Email: jlfountain@murraylaw.com

Attorneys for Debtor

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| In re:<br><br>**ANDRONICO'S MARKETS, INC.,**<br>A California Corporation, aka<br>Andronico's Community Markets,<br><br>Debtor.<br><br>1200 Irving Street<br>San Francisco, CA 94122<br><br>Employer Tax I.D. No.: 94-1307395 | Case No. 11-48963-EDJ-11<br><br>Chapter 11<br><br>*[Date and time subject to entry of order shortening time]*<br>Date: August 23, 2011<br>Time: 10:00 a.m.<br>Place: United States Bankruptcy Court<br>1300 Clay Street, Courtroom 215<br>Oakland, CA 94612<br>Judge: Honorable Edward D. Jellen |

<u>Declaration Of William J. Andronico In Support of Emergency Motions</u>

I, William J. Andronico, declare:

1. I am the Chief Executive Officer of Andronico's Markets, Inc., a California Corporation, the debtor and debtor in possession in the above-captioned bankruptcy case, and am authorized to make this declaration on the Debtor's behalf. I have personal knowledge of the facts set forth in this Declaration, except as to those matters stated on information and belief, and as to those matters, I believe them to be true. If called upon as a witness, I could and would competently testify as follows.

2. This Declaration is filed in support of the following motions (together, the "Emergency Motions") filed concurrently herewith for which the Debtor has requested a hearing on shortened notice to parties in interest, through a separate motion to the Court:

> MOTION FOR ORDER AUTHORIZING THE DEBTOR TO PAY PREPETITION WAGES AND HONOR EMPLOYEE OBLIGATIONS (the "Employee Obligations Motion"); and
>
> MOTION FOR ORDER AUTHORIZING DEBTOR TO (I) CONTINUE PRE-PETITION CASH MANAGEMENT PRACTICES AND (II) MAINTAIN ITS CREDIT CARD MERCHANT PAYMENT SYSTEM (the "Cash Management Motion")[1].

## I. GENERAL FACTUAL BACKGROUND AND HISTORY OF THE DEBTOR

3. Andronico's Markets, Inc., a California corporation, also known as Andronico's Community Markets, ("Andronico's," the "Company" or the "Debtor"), commenced this Chapter 11 case with the filing of its Voluntary Petition on August 22, 2011 (the "Petition Date") and is presently operating its business as a debtor in possession pursuant to the provisions of Bankruptcy Code Sections 1107 and 1108.

4. Andronico's is a leading independent, specialty supermarket operator in the San Francisco Bay Area. Founded in 1929, the Company operates seven stores in prime upscale urban and suburban locations in Berkeley (four stores), San Francisco, Los Altos, and San Anselmo. These areas possess demographics that are closely aligned with the Company's target customer who typically values Andronico's premium offerings, emphasis on freshness and quality, vast selection, excellent customer service, and one-stop shopping capabilities. Ranging in size from 11,000 to 23,000 square feet of selling space, the Company's stores are designed to offer the finest possible shopping experience. In addition to a full selection of everyday grocery items at competitive prices, Andronico's offers a wide variety of specialty items, including goods produced both locally and around the world, natural and organic alternatives, and a premier, restaurant-quality takeout meals department. The Company enjoys strong brand awareness throughout the Bay Area. In addition, Andronico's is highly involved in each of the communities that it serves, and this commitment has helped drive long-term customer loyalty.

---

[1] Terms not defined herein shall have the meaning ascribed in the particular, respective Emergency Motion.

RAF/K:\Andronico's\Pld\First Day Motions\Dec.emer v2.docx  2  DECLARATION OF WILLIAM J. ANDRONICO IN SUPPORT OF EMERGENCY MOTIONS

Case: 11-48963    Doc# 9    Filed: 08/22/11    Entered: 08/22/11 22:47:31    Page 2 of 14

5. Following an ill-fated expansion strategy in the early 2000s when Andronico's opened three new locations, the Company closed all three of the new stores in 2006 after investing nearly $44 million into the projects. During the most recent economic downturn triggered by the financial meltdown in 2008, Andronico's suffered from a decline in sales, erosion of margins, and a hindered balance sheet. These challenges led the Company in 2010 to recruit and hire a new executive team, comprised of experienced industry veterans who previously held leadership positions at Whole Foods Market and Safeway, and who were attracted to Andronico's significant brand equity and potential. Unfortunately, the new leadership was unable to turn the Company around and embark on a growth strategy, which precipitated additional changes and a down-sizing of the management team. The team presently consists of me, as chief executive officer and a 35-year Company veteran, and Justin Jackson, executive vice-president of operations.

6. After substantial declines in sales during fiscal years 2008 and 2009, annual sales have stabilized over the past two fiscal years in the $115 million to $120 million range with gross margins in the range of 38% to 42%. The management team has also significantly reduced expenses, most notably corporate overhead, and closed its Palo Alto location which operated at a loss.

7. The Company's recent financial performance is summarized below.

| $MMs/FYE July | Actual 2007 | Actual 2008 | Actual 2009 | Actual 2010 | Actual YTD July 2, 2011 (1) |
|---|---|---|---|---|---|
| **Sales** | $ 154.0 | $ 149.6 | $ 137.2 | $ 121.5 | $ 108.4 |
| **Gross Margin** | 64.6 | 63.3 | 59.0 | 49.7 | 44.4 |
| *% of Sales* | *41.9%* | *42.3%* | *43.0%* | *40.9%* | *41.0%* |
| **EBITDA** | 9.1 | 7.2 | 8.2 | 2.2 | (0.4) |
| *% of Sales* | *5.9%* | *4.8%* | *5.9%* | *1.8%* | *-0.4%* |
| Adjustments | - | - | - | 1.0 | 1.0 |
| **Adj. EBITDA** | 9.1 | 7.2 | 8.2 | 3.3 | 0.6 |
| *% of Sales* | *5.9%* | *4.8%* | *5.9%* | *2.7%* | *0.5%* |
| **Net Income** | 3.8 | 1.7 | 1.8 | (3.5) | (5.4) |
| *% of Sales* | *2.5%* | *1.1%* | *1.3%* | *-2.9%* | *-5.0%* |

(1) Results for fiscal year through period 12 of 13.

RAF/K:\Andronico's\Pld\First Day Motions\Dec emer v2.docx  3  DECLARATION OF WILLIAM J. ANDRONICO IN SUPPORT OF EMERGENCY MOTIONS

Case: 11-48963    Doc# 9    Filed: 08/22/11    Entered: 08/22/11 22:47:31    Page 3 of 14

8. Andronico's is the borrower under that certain Credit Agreement between the Company and Bank of the West ("BOW") dated as of February 14, 2007 (as amended, the "BOW Credit Agreement") and the "Loan Documents" (as defined in the BOW Credit Agreement), such Loan Documents and the BOW Credit Agreement hereinafter collectively referred to as the "BOW Loan Documents." The outstanding balance under the BOW Loan Documents as of August 19, 2011 is $7,721,315.55, consisting of principal of $7,359,756.10, accrued interest of $16,559.45 and contingent liability for issued letters of credit of $345,000.00, plus fee and expense reimbursement obligations of approximately $172,000.

9. Andronico's is also the borrower under that certain Second Lien Credit Agreement between Borrower and Special Situations Investing, Inc. ("SSI"), a wholly owned subsidiary of JPMorgan Chase & Co., dated as of February 14, 2007 (as amended, the "SSI Credit Agreement") and the "Loan Documents" (as defined in the SSI Credit Agreement), such Loan Documents and the SSI Credit Agreement hereinafter collectively referred to as the "SSI Loan Documents." The outstanding balance under the SSI Loan Documents as of August 19, 2011 is $21,665,618.70, consisting of principal of $20,000,000, accrued interest of $1,665,618.70 plus fee and expense reimbursement obligations of approximately $25,000.

10. On August 19, 2011, Redwood Andronico Lending 1, LLC, a Delaware limited liability company ("RAL"), acquired all of the interests of BOW under the BOW Loan Documents and all of the interests of SSI under the SSI Loan Documents (the "Loan Acquisition"). RAL is owned by Renwood Opportunities Fund 1, LLC and Renovo-Andronico's, LLC. RAL is, therefore, the Debtor's senior secured creditor with a lien on substantially all of the Debtor's assets holding a claim of approximately $29 million. RAL, directly or through one of its affiliates, intends to make a stalking horse bid for the purchase of the Debtor's assets, and contemplates providing debtor in possession financing to the Debtor in this case.

11. Andronico's is a California C-corporation, wholly owned by Solano Enterprise LLC, a California limited liability company. The ownership of Solano Enterprise LLC is divided among various Andronico family members. In February 2007, SSI was issued warrants to purchase up to 25% of the Class A common stock of the Company in conjunction with providing the Debtor with a

RAF/K:\Andronico's\Pld\First Day Motions\Dec.emer v2.docx 4 DECLARATION OF WILLIAM J. ANDRONICO IN SUPPORT OF EMERGENCY MOTIONS

Case: 11-48963    Doc# 9    Filed: 08/22/11    Entered: 08/22/11 22:47:31    Page 4 of 14

$20 million subordinated credit facility. The warrants vested annually over seven years, and as of February 2011 approximately 57% of the warrants had vested (representing 16% of total Class A shares outstanding). On August 19, 2011, SSI surrendered all shares and warrants to the Debtor as part of the Loan Acquisition.

12. The Company anticipates claims under the Perishable Agricultural Commodities Act ("PACA") of approximately $581,070, and Section 503(b)(9) claims of approximately $1,905,352. The Company is also a party to seven non-residential real property leases and numerous equipment leases.

13. Andronico's currently employs a total of 469 employees, comprised of 27 at headquarters of which 25 are full time, and 442 at the store level of which 206 are full time. Fifty-two of the Company's employees are not represented by a union. The Company's store labor force is unionized and part of the United Food and Commercial Workers Union. The collective bargaining agreement between the union and the Company expires in October 2011.

14. On October 29, 2010, the Debtor retained the services of Bailey, Elizondo & Brinkman LLC ("BEBLLC") to serve as its financial and restructuring advisor to assist it in evaluating restructuring alternatives, negotiating with its lenders, and canvassing the marketplace for potential investors or buyers. From February through June, 2011, BEBLLC identified 46 prospective candidates, received executed non-disclosure agreements from 25 of them, and letters of intent from 3.

15. There are presently 3 parties who may be interested in acquiring the assets of the Company. The Debtor intends to conduct an auction of its assets as a single lot, and to assume and assign those real property and equipment leases that are critical to the ongoing business operation.

## II. THE DEBTOR'S CHAPTER 11 BUSINESS PLAN AND THE EMERGENCY MOTIONS

16. As described above, in this Chapter 11 case, the Debtor plans to continue its operations so as to maintain its going concern value and maximize the value of its assets for the benefit of creditors. In that regard, the Debtor further intends to file motions to approve bidding procedures and for approval of a sale of substantially all of the Debtor's assets to the Debtor's pre-petition secured lender or highest bidder. To finance its operations pending the sale, the Debtor has

RAF/K:\Andronico's\Pld\First Day Motions\Dec.emer.v2.docx 5 DECLARATION OF WILLIAM J. ANDRONICO IN SUPPORT OF EMERGENCY MOTIONS

Case: 11-48963  Doc# 9  Filed: 08/22/11  Entered: 08/22/11 22:47:31  Page 5 of 14

agreed with its pre-petition secured lender on the use of cash collateral, a post-petition debtor-in-possession financing facility and a budget approved by the secured lender (the "<u>Budget</u>").[2] The Budget assumes, among other things, that (a) the Debtor will be authorized to pay prepetition wages and honor accrued PTO as requested in the Employee Obligations Motion, and (b) the Company's cash management system and its credit card merchant payment system remain in place.

### A. EMPLOYEE OBLIGATIONS MOTION

**The Company's Workforce**

17. The Company currently employs a total of 469 employees in its seven (7) Northern California stores, comprised of 27 at headquarters of which 25 are full time, and 442 at the store level of which 206 are full time.

18. The Debtor anticipates that most, if not all, of its current employees will remain as full-time employees on an as-needed basis through the asset sale. Subsequent to the sale, the Debtor is informed and believes that its secured lender will retain some, if not a large majority, of the employees if it is the successful purchaser. Retention of the Company's employees is an integral component to the sale.

19. The Company's workforce is critical to its business operations. Each of the Company's employees is essential not only to the continued, uninterrupted operation of the business, but to effectuating the orderly administration of the Debtor's Bankruptcy Case. The Company's employees have distinct experience and expertise that are vital to its operations.

20. Amongst other things, the Company requires its management employees to execute the development, maintenance, communications, accounting, marketing and customer service functions associated with its operations. The Company also requires its employees at its seven (7) locations to continue to provide services to customers to maintain the going concern value of the assets pending the sale, and ensure a seamless transition to the buyer of the assets. Failure to maintain relationships with customers and suppliers will open the door to competitors and will eliminate revenue and growth. As a result, the Company's business will lose its going concern

---

[2] The Debtor will be filing a "first day" motion requesting the Court's entry of interim and final orders approving the use of cash collateral of, and the terms and conditions of the Debtor's secured financing facility to be extended by, the Debtor's secured lender.

RAF/K:\Andronico's\Pld\First Day Motions\Dec.emer v2.docx  6  DECLARATION OF WILLIAM J. ANDRONICO IN SUPPORT OF EMERGENCY MOTIONS

Case: 11-48963    Doc# 9    Filed: 08/22/11    Entered: 08/22/11 22:47:31    Page 6 of 14

value, and its assets, including its customer relations, will be harmed.

21. Because of financial constraints, the Debtor downsized its management team last year. It is therefore even more critical that the remaining employees continue functioning at their positions.

22. The Company's payroll department is located in its San Francisco headquarters office, but its payroll is processed by Automatic Data Processing, Inc. ("<u>ADP</u>").

**<u>Prepetition Wages and Expenses</u>**

23. All employees, including those covered under a collective bargaining agreement, are paid weekly (for services performed Sunday to Saturday). Typically, the Debtor submits its payroll to ADP on Monday. ADP withdraws the funds from Andronico's payroll account via two payments: 1) the first one on Tuesday for payroll, and 2) the second on Wednesday for payroll taxes and garnishments. ADP then pays the payroll and payroll taxes on Thursday. As of the Petition Date, the employees have been paid through Saturday, August 13, 2011. The Debtor requests authorization to fund on Tuesday or Wednesday of this week the payroll related to Sunday, August 14, 2011 to Saturday, August 20, 2011. Hours worked on Sunday, August 21, 2011 are also prepetition claims, and through this Employee Obligations Motion, the Debtor seeks authorization to pay those wages as well. However, wages for August 21, 2011 will be funded as part of the normal post-petition funding scheduled for Tuesday (August 30, 2011) and Wednesday (August 31, 2011), which will be a normal payroll cycle for the payroll department.

24. The Debtor's secured lender has indicated that it will consent to the Debtor's use of cash collateral to fund payroll for the week of August 14, 2011 through August 20, 2011, subject to the Court's entry of an interim order authorizing the use of cash collateral and debtor-in-possession financing.

25. The Debtor believes that the aggregate amount of the Prepetition Wages earned within the 180-day period before the Petition Date is approximately $425,000. The Debtor does not believe that any individual employee is owed more than $11,725.00 in Prepetition Wages. If applicable, any amount owed above the statutory priority limit of $11,725.00 will not be paid, but will instead be treated as a general unsecured claim in the Bankruptcy Case. The Company will pay

RAF/K:\Andronico's\Pld\First Day Motions\Dec.emer v2.docx 7 DECLARATION OF WILLIAM J. ANDRONICO IN SUPPORT OF EMERGENCY MOTIONS

Case: 11-48963 Doc# 9 Filed: 08/22/11 Entered: 08/22/11 22:47:31 Page 7 of 14

all postpetition employee wages in the ordinary course.

26. The Company customarily reimburses its employees for business expenses incurred in performing their duties such as for travel, meals, mileage, and telephone use. The Debtor believes there are employees who have not submitted outstanding prepetition expense reimbursement claims, totaling approximately $5,000. In addition, the Debtor believes that there may be other employees that may not have submitted all claims timely.

**Prepetition PTO**

27. In the ordinary course, the Company provides allotted PTO days (consisting of accrued vacation, sick time, and floating holiday time) to its employees. The Debtor requests authority to continue to honor PTO earned by current employees and to allow such employees to use prepetition accrued PTO in the ordinary course of business.

28. PTO accrues at 120-200 hours per year with a maximum accrual of one (1) times the employee's annual vacation hours allowed. Through the Petition Date, the Company's employees have accrued an aggregate of approximately 39,000 hours of PTO which amounts to approximately to $817,717.66 in value of which $544,073.05 was earned within the 180-day period before the Petition Date.

29. The Company does not intend to "cash out" PTO benefits to current employees at this time but only intends to honor such benefits by allowing employees to use PTO in the ordinary course. The Debtor does not believe that any current employee has accrued PTO within 180 days of the bankruptcy filing which exceeds $11,725.00[3].

30. In the event of a post-petition termination, if applicable, employees will be entitled to an aggregate prepetition priority claim up to $11,725.00, earned within 180 days of the bankruptcy filing, with the balance being a general unsecured claim.

31. The Debtor believes that its failure to satisfy and honor outstanding obligations to its employees will create concern and discontent among its employees, and adversely affect the employees' esprit de corps. Moreover, it will undermine the Debtor's ability to retain its employees.

---

[3] However, when combined with the Prepetition Wages, the Debtor believes that two (2) employees may exceed $11,725.00.

RAF/K:\Andronico's\Pld\First Day Motions\Dec.emer v2.docx  8  DECLARATION OF WILLIAM J. ANDRONICO IN SUPPORT OF EMERGENCY MOTIONS

Case: 11-48963   Doc# 9   Filed: 08/22/11   Entered: 08/22/11 22:47:31   Page 8 of 14

If the Debtor cannot promptly assure its employees that their wages and expenses will be paid and that their accrued PTO will be honored during the Bankruptcy Case, immediate and irreparable harm may result due to the employees' relocating or resigning prior to the consummation of the sale. The Debtor's ability to pay employee wages and honor accrued PTO is integral to maintaining continuity and order to the Debtor's business activities through the retention of its employees. At this critical state, the Debtor cannot risk a significant disruption in its operations caused by low employee morale and the loss of key employees. The Debtor's remaining employees have unique experience and expertise which are vital to the Debtor's operations.

32. The Debtor believes that through the use of cash collateral and debtor-in-possession financing as set forth in the Budget, it will have sufficient operating cash to satisfy its obligations to employees, including the Prepetition Wages and expenses as well as postpetition wages, as they come due in the ordinary course of the Debtor's business. In addition, the Debtor submits that the relevant time periods for which payment is requested fall within the 180 days prior to the Petition Date. As its employees are necessary to maintain the value of the Debtor as a going concern, the Debtor believes that the relief requested herein is modest in light of the perceived benefit to the bankruptcy estate.

### B. THE CASH MANAGEMENT MOTION

**The Cash Management System**

33. In the ordinary course of business, the Company maintains an integrated cash management system that provides well-established processes for the collection, concentration, management, monitoring, disbursement and investment of funds generated and used in its operations (the "Cash Management System").

34. The Cash Management System enables the Company to effectively manage and monitor the inflow of receipts and outflow of disbursements from its stores, and accommodates the Company's reliance on third-party providers who process customer payments. It is critical that the Cash Management System remain intact to ensure seamless customer experiences and continued collection of revenues for the Debtor's estate.

35. The Cash Management System consists of sixteen (16) bank accounts (collectively,

RAF/K:\Andronico's\Pld\First Day Motions\Dec.emer v2.docx 9 DECLARATION OF WILLIAM J. ANDRONICO IN SUPPORT OF EMERGENCY MOTIONS

Case: 11-48963  Doc# 9  Filed: 08/22/11  Entered: 08/22/11 22:47:31  Page 9 of 14

the "Bank Accounts"), including a single master account (the "Concentration Account") at BOW (i.e., Bank of the West as defined above) where cash is generally concentrated, and is used to receive incoming payments, deposit checks and make disbursements in the ordinary course of the Company's business.

36. As part of their daily operations, the Company's stores collect cash, checks, credit card, debit and electronic benefit transfer ("EBT") payments into separate accounts at each store (the "Store Accounts"). The Store Accounts are zero-balance, deposit accounts only, and, therefore, no disbursements are made from the Store Accounts. All cash is swept from the Store Accounts into the Concentration Account at the end of each business day.

37. Disbursements are made from five (5) designated accounts which are funded from the Concentration Account: (a) a payroll account (the "Payroll Account") at BOW which is a zero-balance account used to fund payroll to the Company's payroll processor, Automatic Data Processing, Inc. ("ADP"); (b) a 401(k) account at BOW which is a zero-balance account used to fund weekly 401(k) contributions; (c) a payables account (the "Payables Account") at BNY Mellon ("Mellon") which is a zero-balance account used to fund non-payroll, account payables; and (d) two (2) accounts at Mechanics Bank used to fund two of the Company's customer programs (together, the "Customer Program Accounts").

38. Disbursements are typically made through one of three methods: (a) a traditional written check; (b) wire transfers from the Debtor's disbursement accounts; or (c) automatic clearing house payments ("ACH Payments").

39. The Company maintains detailed and accurate records of all disbursements and transfers flowing within and outside of the Cash Management System, including all checks that are written on its accounts. The electronic, Web-based services offered by BOW and Mellon allow the Company, *inter alia*, to easily monitor its disbursement account balances and activity, and to generate reports, hold and release checks, and, with respect to the BOW accounts, stop payments, transfer funds and send wires and ACH payments. In addition, BOW and Mellon transmit hard copies of account documentation to the Company and provide access to bank representatives familiar with the Company.

RAF/K:\Andronico's\Pld\First Day Motions\Dec.emer.v2.docx 10 DECLARATION OF WILLIAM J. ANDRONICO IN SUPPORT OF EMERGENCY MOTIONS

Case: 11-48963  Doc# 9  Filed: 08/22/11  Entered: 08/22/11 22:47:31  Page 10 of 14

40. Approximately $175,000 to $1,000,000 flows through the Cash Management System on a daily basis.

41. Maintaining the Cash Management System in its current state is crucial to the Company's operations in light of the relatively significant volume of cash transactions managed through the Cash Management System every day. The Company is familiar with the Cash Management System which enables the Company to reconcile, control and monitor its accounts in a seamless, expedient fashion. Any disruption to the Cash Management System would unnecessarily disrupt the Company's complex day-to-day operations and thereby cause unnecessary harm to the estate. The Debtor therefore requests that it be allowed to continue the Cash Management System and related historical practices and that its banks be ordered to honor checks and disbursements from the Bank Accounts.

42. The Company currently has, and seeks to maintain, a general account (the Concentration Account), its 401(k) account, the Payables Account, the Payroll Account, the Credit Card Accounts and the Customer Program Accounts.[4] The Store Accounts and the Credit Card Accounts will be continued strictly as deposit accounts, and no disbursements will be made from them other than transfers to the Concentration Account. This allows, and will continue to allow, the Debtor to control disbursements and prevent against the unintended payment of any pre-petition obligations.

43. The Debtor respectfully submits that closing the existing accounts and opening new ones would result in needless costs in both time and money with no discernible benefit to the estate. For example, closing the Payroll Account and opening another will provide no benefit and only be an additional burden to the Debtor. No disbursements are made out of the Payroll Account except for payroll.[5] Pursuant to the Employee Obligations Motion, the Debtor has requested authorization to pay employee pre-petition wages and to honor employee vacation and paid time off. To the extent that the Court grants such motion, maintenance of the Payroll Account is critical to ensure that the Debtor is able to pay its employees and maintain employee goodwill.

---

[4] The amount held in the Customer Program Accounts generally is nominal.
[5] ADP directly accesses the Payroll Account for all payroll and payroll tax expenses. Payroll is paid by direct deposit or issuance of checks.

RAF/K:\Andronico's\Pld\First Day Motions\Dec.emer.v2.docx  11  DECLARATION OF WILLIAM J. ANDRONICO IN SUPPORT OF EMERGENCY MOTIONS

Case: 11-48963   Doc# 9   Filed: 08/22/11   Entered: 08/22/11 22:47:31   Page 11 of 14

44. In addition, the Company does not presently maintain an account for tax purposes. Instead, the Company monitors and processes funds for payment of taxes through its Cash Management System to assure that taxes are paid appropriately. Requiring the Debtor to open an additional tax account would require the Debtor to revise its Cash Management System and compel it to devote more personnel time to maintaining the new account.

**The Credit Card Merchant Payment System**

45. As with many retail grocery markets, the majority of the Company's customers pay for their purchases with various credit cards, bank debit cards and EBT payments. Historically, the Company's credit card sales volume average approximately $99,000,000 annually. The Company, as a community oriented grocery store, has accepted credit cards since its inception, in an industry where its competitors accept credit cards and debit cards. Its customers shop at the Company's stores with the expectation of being able to pay by credit card, debit card or EBT. Turning away unsuspecting customers who are unable to pay with cash would not only result in the direct loss of those sales, but could also upset customers, leaving them angry and unsatisfied, damaging goodwill. In addition, the Company also provides catering services for large scale purchases where the ability to accept credit cards is imperative. Consequently, any interruption with the Company's ability to accept and process credit cards, debit cards and EBT payments, even for a minimal time, would result in lost sales and diminished customer goodwill.

46. The Debtor has various agreements pursuant to which it maintains a system (the "Credit Card Merchant Payment System") which facilitates payments by customers with credit cards, bank debit cards or EBT payments, the Debtor is a party to that certain MERCHANT ACCOUNT CREDIT CARD PROCESSING AGREEMENT (the "First Data Agreement") with First Data Corporation ("First Data") for its MasterCard, Visa and debit card transactions and its EBT payments, with customers. Pursuant to the First Data Agreement, credit card, debit card and EBT sales are submitted to First Data who then processes the sales and submits the appropriate funds to a zero balance account at BOW for sales processed by First Data (the "First Data Account"), less certain fees between one percent (1%) and two percent (2%) percent of all sales as set forth in the First Data Agreement. First Data offsets any costs incurred from chargebacks from new receipts.

RAF/K:\Andronico's\Pld\First Day Motions\Dec.emer.v2.docx  12  DECLARATION OF WILLIAM J. ANDRONICO IN SUPPORT OF EMERGENCY MOTIONS

Case: 11-48963   Doc# 9   Filed: 08/22/11   Entered: 08/22/11 22:47:31   Page 12 of 14

47. The Company is a party to two additional similar agreements: (a) a credit card processing agreement (the "<u>AMEX Agreement</u>") with American Express ("<u>AMEX</u>") for the processing of customer purchases with AMEX credit cards, and (b) a credit card processing agreement (the "<u>Discover Agreement</u>" and collectively with the First Data Agreement and the AMEX Agreement, the "<u>Processing Agreements</u>") with Discover Bank ("<u>Discover</u>" and together with First Data and AMEX, the "<u>Payment Processors</u>"), for the processing of customer purchases with Discover credit cards. The Debtor pays processing fees to AMEX between two percent (2%) and three percent (3%) percent of all sales and Discover between zero percent (0%) and two percent (2%) of all sales on the first day of each month pursuant to their respective Processing Agreements. Sales purchased with AMEX and Discover credit cards are processed by AMEX and Discover, respectively, who then submit the appropriate funds to the Company's zero balance accounts at BOW designated for each of AMEX and Discover (together with the First Data Account, the "<u>Credit Card Accounts</u>"). AMEX and Discover offset any costs incurred from chargebacks from new receipts.

48. Approximately ninety-three percent (93%) of the Company's aggregate monthly sales transactions are made via credit card, debit card or EBT sales. The projected total sales via these payment methods for the month of August 2011 are approximately $7,000,000. The Debtor estimates that the fees to be paid to the Payment Processors for the month of August will be between $115,000 and $135,000. The Processing Agreements are critical to the Company's ongoing business. The Debtor might be unable to find alternative merchant services similar to those provided by the Payment Processors, and any loss of services from the Payment Processors will cause a deleterious lapse in the Company's ability to accept payment.

49. The Debtor believes that the fees collected by the Payment Processors are *de minimus* in relation to the value the Processing Agreements bring to the Debtor's overall ability to collect and process payments and transact purchases. As such, maintaining the relationship with the Payment Processors is essential for the Debtor to facilitate sales to its customers. The Payment Processors do not have any significant risk of loss by continuing their services, as their costs and processing fees are deducted from funds received for each transaction. To the extent that the Payment Processors

RAF/K:\Andronico's\Pld\First Day Motions\Dec.emer.v2.docx 13 DECLARATION OF WILLIAM J. ANDRONICO IN SUPPORT OF EMERGENCY MOTIONS

Case: 11-48963   Doc# 9   Filed: 08/22/11   Entered: 08/22/11 22:47:31   Page 13 of 14

have not settled all pre-petition card transactions and collected their respective fees related thereto prior to the Petition Date, the Debtor requests authority to allow the Payment Processors to collect pre-petition fees related to pre-petition card transactions settled on behalf of the Debtor.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this Declaration is executed on August 22, 2011.

*/s/ William J. Andronico*
William J. Andronico

RAF/K:\Andronico's\Pld\First Day Motions\Dec.emer.v2.docx
14
DECLARATION OF WILLIAM J. ANDRONICO IN SUPPORT OF EMERGENCY MOTIONS
Case: 11-48963    Doc# 9    Filed: 08/22/11    Entered: 08/22/11 22:47:31    Page 14 of 14