1  JOHN WALSHE MURRAY (074823)
   DORIS A. KAELIN (162069)
2  JENNY LYNN FOUNTAIN (226241)
   MURRAY & MURRAY
3  A Professional Corporation
   19400 Stevens Creek Blvd., Suite 200
4  Cupertino, CA 95014-2548
   Telephone:  (650) 852-9000; (408) 907-9200
5  Facsimile:  (650) 852-9244
   Email:  jwmurray@murraylaw.com
6  Email:  dkaelin@murraylaw.com
   Email:  jlfountain@murraylaw.com
7
8  Attorneys for Debtor

9

10              UNITED STATES BANKRUPTCY COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12                    OAKLAND DIVISION

13  In re:                          )
                                    )
14  **ANDRONICO'S MARKETS, INC.,**        )   Case No. 11-48963-EDJ-11
    A California Corporation, aka    )
15  Andronico's Community Markets,   )        Chapter 11
                                     )
16                Debtor.            )   *[To Be Determined Pursuant To Motion For*
                                     )   *Order Shortening Time]*
17        1200 Irving Street         )
          San Francisco, CA 94122    )
18                                   )
    Employer Tax I.D. No.: 94-1307395 )
19

20        **MOTION TO APPROVE OVERBID PROCEDURES AND RELATED**
21        **MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTOR**

22

23

24

25

26

27

28

Case: 11-48963   Doc# 37   Filed: 08/24/11   Entered: 08/24/11 17:08:14   Page 1 of 22

# TABLE OF CONTENTS

Page

I.    Summary Of Sale And Relief Sought......................................................................1

II.   Background Summary.........................................................................................3

III.  The Motion.....................................................................................................7

      A.    Bidding Procedures...................................................................................7
      B.    Breakup Fee............................................................................................7
      C.    Scheduling of Sale Hearing.......................................................................8
      D.    Provisions for Notice and Objection Dates.................................................8

IV.   Argument......................................................................................................12

      A.    This Court Should Approve the Proposed Bid Procedures Because
            The Procedures Are Fair, Reasonable And In The Best Interests
            of Debtor's Estate.................................................................................12

DAK
C:\...\...\Not-bid...\...res3 v3.5.pdf

MOTION TO APPROVE OVERBID PROCEDURES AND RELATED
MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTOR

# TABLE OF AUTHORITIES

Page(s)

CASES

Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),
181 F.3d 527 (3d Cir. 1999).................................................................................14, 15

In re 995 Fifth Ave. Assocs., L.P.,
96 B.R. 24 (Bankr. S.D.N.Y. 1989)......................................................................13

In re America West Airlines, Inc.,
166 B.R. 908 (Bankr. D. Ariz. 1994).....................................................................13

In re APP Plus, Inc.,
223 B.R. 870 (Bankr. E.D.N.Y. 1998)...................................................................12, 14

In re Bethlehem Steel Corp.,
2003 U.S. Dist. LEXIS 12909 (S.D.N.Y. July 28, 2003) ....................................13, 14

In re Hupp Indus., Inc.,
140 B.R. 191 (Bankr. N.D. Ohio 1992)..................................................................13

Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re
Integrated Resources, Inc.),
147 B.R. 650 (S.D.N.Y. 1992)................................................................................13

Otto Preminger Films, Ltd. v. Qintex Entertainment, Inc. (In re Qintex Entertainment, Inc.),
950 F.2d 1492 (9th Cir. 1991) ................................................................................12

STATUTES

11 U.S.C. § 363...........................................................................................................1, 13

Bankruptcy Code § 363(b)...........................................................................................12

Bankruptcy Procedure § 503........................................................................................14

Bankruptcy Code Sections 1107 and 1108 ..................................................................4

Bankruptcy Rules 2002.................................................................................................9

Bankruptcy Rule 6004(f)(1)..........................................................................................12

OTHER AUTHORITIES

3 Collier on Bankruptcy ¶ 363.02[7] (15th ed. rev. 2009)..........................................13

Fed. R. Bankr. P. 6004(f)(1) .........................................................................................12

Fed. R. Bankr. P. 9014 ...........................................................................................................10

Federal Rules of Bankruptcy Procedure 2002 and 6004 ...............................................................1

Rule 6004 of the Federal Rules of Bankruptcy Procedure ...........................................................12

§ 503(b)(9) ....................................................................................................................................5

§ 365(b)(1)(A) and (B).................................................................................................................11

3 F.3d 49 (2d Cir. 1993)...............................................................................................................13

iii

MOTION TO APPROVE OVERBID PROCEDURES AND RELATED
MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTOR

1                                           **EXHIBIT LIST**

2   **EXHIBIT "A"**           [Proposed] Bid Procedures

DAK
C:\...\Ardmore\Stalking-horse bid procedures Motion v3.5.doc

MOTION TO APPROVE OVERBID PROCEDURES AND RELATED
MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTOR

Andronico's Market's Inc., a California corporation, the debtor and debtor in possession herein, ("Andronico's", the "Company", or the Debtor"), hereby moves for entry of an order approving certain sale procedures in connection with the proposed sale of substantially all of the Debtor's assets to Renwood Andronico Lending 1, LLC, a Delaware limited liability company (or its designee) ("Buyer" or "Renwood").

This motion (the "Motion" or "Bid Procedures Motion") is made pursuant to 11 U.S.C. § 363 and Federal Rules of Bankruptcy Procedure 2002 and 6004. This Motion is supported by the DECLARATION OF WILLIAM R. BRINKMAN IN SUPPORT OF MOTION FOR ORDER APPROVING OVERBID PROCEDURES AND RELATED MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTOR, and the DECLARATION OF DORIS A. KAELIN IN SUPPORT OF MOTION FOR ORDER APPROVING OVERBID PROCEDURES AND RELATED MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTOR (the "Kaelin Declaration"), and will be based on such other evidence and argument as may be presented at the hearing on the Motion.

## I.  SUMMARY OF SALE AND RELIEF SOUGHT

1. Following several months of marketing by its financial and restructuring advisor, the Company signed a letter of intent with Renovo Capital, LLC ("RCL") with respect to entering into one or more transactions, with the specific structure of the transactions then still to be determined (the "RCL LOI"). As discussed below, RCL's affiliate, Renwood Andronico Lending 1, LLC, is the Debtor's senior secured creditor with a lien on substantially all of the Debtor's assets holding a claim of approximately $29 million (the "Pre-Petition Debt"). The Debtor has agreed to sell substantially all of its assets (the "Sale") to Renwood pursuant to the terms of an Asset Purchase Agreement  (the "Purchase Agreement"). The Debtor and Buyer anticipate that the Purchase Agreement will be finalized on or before September 2, 2011 as required by the DIP Credit Agreement (defined below). A copy of the executed Purchase Agreement will be posted to the website to be set up by the Debtor's notice agent for public access and will be filed with the motion to approve the Sale (the "Sale Motion").

2. Pursuant to the Purchase Agreement, Buyer will pay approximately twenty million dollars ($20,000,000) in a combination of cash and a credit bid against the Debtor's obligations to

Buyer under the DIP Facility (defined and discussed below) and/or the Prepetition Debt (Buyer will have the sole discretion to determine whether its credit bid is on account of Prepetition Debt or amounts owed under the DIP Facility)-, which includes (x) the cure amounts required pursuant to the executory contracts and unexpired leases to be assumed and assigned pursuant to the Sale, and (y) assumption of certain liabilities, including the funding of certain administrative expenses as specified in the Purchase Agreement (collectively, the "Purchase Price") for the Assets.

3.     Substantially all of the Debtor's assets will be included in the Sale, as will be set forth more fully in the Purchase Agreement (the "Purchased Assets"). The Purchase Agreement will exclude, among other things, cash up to a specified amount, certain avoidance claims and causes of action. The Purchase Agreement further provides for the assumption and assignment of certain specified executory contracts and unexpired leases of the Debtor. The sale of the Purchased Assets will be free and clear of all liens, claims, encumbrances and other interests to the fullest extent allowed by law except as provided by the Purchase Agreement.

4.     In connection with the Purchase Agreement and the Sale, and pursuant to that certain DEBTOR IN POSSESSION CREDIT AGREEMENT (the "DIP Credit Agreement"), the Debtor proposes to use cash collateral and borrow up to $5 million (collectively, the "DIP Financing") in a DIP credit facility (the "DIP Facility") provided by Buyer to provide ongoing working capital to fund the Debtor's operations and certain Chapter 11 administrative expenses pending the sale of the Purchased Assets to the highest bidder pursuant to the Sale Motion. The Debtor's motion to approve the DIP Financing is the subject of a separate motion before the Court.

5.     Pursuant to the DIP Credit Agreement, the Debtor is required to meet certain milestones to avoid a default. Among these milestones is that the Court enter an order approving the Bid Procedures (defined below) on or before August 31, 2011, and that the Court enter orders granting the Sale Motion and related motion to assume and assign executory contracts and unexpired leases (the "Assumption Motion") on or before September 30, 2011. Finally, the Sale must close on or before October 7, 2011.

6.     In its Chapter 11 case, the Debtor contemplates that it will continue its operations under the budget (as may be amended from time to time) approved by Buyer in connection with the

DIP Credit Agreement. The Debtor intends to file the Sale Motion and the Assumption Motion as soon as paracticable after entry of the Bid Procedures Order (defined below), but in any event, no later than September 6, 2011.

7.     As discussed further below, the Debtor believes that the Sale pursuant to the Bid Procedures will allow the Debtor to maximize the value of the Purchased Assets. The Debtor further believes that the scheduling of the Sale Hearing (defined below) on or before September 29, 2011 will provide sufficient opportunity for other interested persons to submit a competing bid and participate in the auction. A closing as soon as possible in October is critical to Buyer, and is anticipated to be critical to other bidders, because of the seasonal nature of the business (November and December being the busiest months for the business). The Debtor's access to cash collateral and DIP Financing also terminates if the required orders approving the Sale are not entered by September 30. Without access to cash collateral or DIP Financing, the Company will not have adequate financing or resources to sustain operations. The Debtor believes that an expedited sale process is in the best long-term interest of the Debtor's customers, vendors and employees.

8.     By this Motion, the Debtor seeks approval of certain bid procedures (the "Bid Procedures") including the terms and conditions of any competing bids and a breakup fee of 3% of the Purchase Price, or $600,000 (the "Breakup Fee") in the event a sale closes to another purchaser.

9.     Pursuant to this Motion, the Debtor also requests that the Court specially set, on shortened time, the hearing (the "Sale Hearing") on the Sale Motion and the Assumption Motion. The Debtor requests that the Sale Hearing be scheduled on or before September 29, 2011. As set forth below, the Debtor requests that the Court (i) authorize notice of the hearing on the Sale Motion and the Assumption Motion, and service of the underlying pleadings in support of the Sale Motion and the Assumption Motion and any objections thereto, be shortened as requested herein, and (ii) deem service as proposed herein to be sufficient under the circumstances.

## II.     BACKGROUND SUMMARY[1]

10.     Andronico's commenced this Chapter 11 case with the filing of its Voluntary Petition

---

[1] Additional background regarding the Company is set forth in the first day motions filed with the Court.

MOTION TO APPROVE OVERBID PROCEDURES AND RELATED MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTOR.

on August 22, 2011 (the "<u>Petition Date</u>") and is presently operating its business as a debtor in possession pursuant to the provisions of Bankruptcy Code Sections 1107 and 1108.

11.     No official committee of unsecured creditors has been formed in the bankruptcy case to date.

12.     Andronico's is a leading independent, specialty supermarket operator in the San Francisco Bay Area.  Founded in 1929, the Company operates seven stores in prime upscale urban and suburban locations in Berkeley (four stores), San Francisco, Los Altos, and San Anselmo.

13.     Following an ill-fated expansion strategy in the early 2000s when Andronico's opened three new locations, the Company closed all three of the new stores in 2006 after investing nearly $44 million into the projects.  During the most recent economic downturn triggered by the financial meltdown in 2008, Andronico's suffered from a decline in sales, erosion of margins, and a hindered balance sheet.  These challenges led the Company in 2010 to recruit and hire a new executive team, comprised of experienced industry veterans who previously held leadership positions at Whole Foods Market and Safeway, and who were attracted to Andronico's significant brand equity and potential.  Unfortunately, the new leadership was unable to turn around the Company and embark on a growth strategy which precipitated additional changes and a down-sizing of the management team.  The team presently consists of chief executive officer William J. Andronico, a 35-year Company veteran, and Justin Jackson, executive vice-president of operations.

14.     After substantial declines in sales during fiscal years 2008 and 2009, annual sales have stabilized over the past two fiscal years in the $115 million to $120 million range with gross margins in the range of 38% to 42%.  The management team has also significantly reduced expenses, most notably corporate overhead, and closed its Palo Alto location that operated at a loss.

15.     Andronico's is the borrower under that certain Credit Agreement between the Company and Bank of the West ("<u>BOW</u>") dated as of February 14, 2007 (as amended, the "<u>BOW Credit Agreement</u>") and the "<u>Loan Documents</u>" (as defined in the BOW Credit Agreement), such Loan Documents and the BOW Credit Agreement hereinafter collectively referred to as the "<u>BOW Loan Documents</u>."  The outstanding balance under the BOW Loan Documents as of August 19, 2011 is $7,721,315.55, consisting of principal of $7,359,756.10, accrued interest of $16,559.45 and

DAK
G:\Andronico's\DIP\1st-day\procedures\Mot v3.doc

4

MOTION TO APPROVE OVERBID PROCEDURES AND RELATED
MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTOR.

contingent liability for issued letters of credit of $345,000.00, plus fee and expense reimbursement obligations of approximately $172,000.

16.     Andronico's is also the borrower under that certain Second Lien Credit Agreement between Borrower and Special Situations Investing, Inc. ("SSI"), a wholly owned subsidiary of JPMorgan Chase & Co., dated as of February 14, 2007 (as amended, the "SSI Credit Agreement") and the "Loan Documents" (as defined in the SSI Credit Agreement), such Loan Documents and the SSI Credit Agreement hereinafter collectively referred to as the "SSI Loan Documents").  The outstanding balance under the SSI Loan Documents as of August 19, 2011 is $21,665,618.70, consisting of principal of $20,000,000, accrued interest of $1,665,618.70 plus fee and expense reimbursement obligations of approximately $25,000.

17.     On August 19, 2011, Renwood acquired all of the interests of BOW under the BOW Loan Documents and all of the interests of SSI under the SSI Loan Documents (the "Loan Acquisition").   Renwood is owned by Renwood Opportunities Fund 1, LLC and Renwood-Andronico's, LLC.

18.     Renwood is, therefore, the Debtor's senior secured creditor with a lien on substantially all of the Debtor's assets holding a claim of approximately $29 million.  The Company anticipates claims under the Perishable Agricultural Commodities Act ("PACA") of approximately $581,070, and Section 503(b)(9) claims of approximately $1,905,352.  The Company is also a party to seven non-residential real property leases and numerous equipment leases.  The Company's unsecured debt as of the Petition Date is estimated at $11.7 million, however this amount may change based upon the final bankruptcy schedules.

19.     Andronico's currently employs 469 employees.  Fifty-two of the Company's employees are not represented by a union.  The Company's store labor force is unionized and part of the United Food and Commercial Workers Union.  The collective bargaining agreement between the union and the Company expires in October 2011.

/ / /

/ / /

/ / /

20.     Andronico's is a California C-corporation, owned by Solano Enterprises LLC, a California limited liability company.[2] The ownership of Solano Enterprises LLC is divided among various Andronico family members.

21.     On October 29, 2010, the Debtor retained the services of Bailey, Elizondo & Brinkman LLC ("BEBLLC") to serve as its financial and restructuring advisor to assist the Company in the evaluation of restructuring alternatives, negotiation with the its lenders, and in canvassing the marketplace for potential investors or buyers. BEBLLC prepared a confidential information memorandum detailing the Company, its history, and the investment or acquisition opportunity, and beginning in February 2011 and through June 2011, BEBLLC and Company management identified 46 prospective candidates, received executed non-disclosure agreements from 25 of them, and letters of intent from 3. BEBLLC and the Company believe that there has been extensive marketing of the Company's assets.[3]

22.     After marketing the opportunity for approximately five months, in June 2011, Andronico's entered into the RCL LOI. The RCL LOI included a sixty day exclusivity period during which time Andronico's agreed to work exclusively with RLC. Pursuant to the RCL LOI, Buyer has been reimbursed for $100,000 of its pre-petition out of pocket expenses pertaining to due diligence, evaluation of the form of the transaction, among other expenses. The RCL LOI provided a $150,000 cap on such expenses prior to Buyer's agreement to proceed with an auction in bankruptcy with the opportunity for overbid.

23.     There are presently three parties, including Renwood, who may be interested in acquiring all of the assets of the Company. The Company believes there may be 5-10 additional interested parties with respect to the purchase of one or more stores. The Debtor intends to conduct

---

[2] Prior to the Loan Acquisition, SSI held a stock interest in the Company. Specifically, in February 2007, SSI was issued warrants to purchase up to 25% of the Class A common stock of the Company in conjunction with providing the Company with a $20 million subordinated credit facility. The warrants vested annually over seven years, and as of February 2011 approximately 57% of the warrants had vested (representing 16% of total Class A shares outstanding). On August 19, 2011, SSI surrendered all shares and warrants to the Debtor as part of the Loan Acquisition.

[3] Additional details of the Debtor's pre-petition and post-petition marketing efforts will be provided in connection with the Sale Motion. The Debtor will supplement the record as may be required by the Court at the hearing on this Motion and at the Sale Hearing.

DAK
SE\Andronico's\Plan\over-bid procedures\mot v3.doc                    6

Case 11-48963   Doc# 37   Filed: 08/24/11   Entered: 08/24/11 17:08:14   Page 11 of 22

MOTION TO APPROVE OVERBID PROCEDURES AND RELATED MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTOR.

an auction of its assets as a whole rather than on a store by store basis, and to assume and assign those real property and equipment leases that are critical to the ongoing business operation. Establishment of the bid procedures will provide a formalized process and assist in the Debtor's efforts to encourage diligence by possible acquirers.

24.     The Debtor has established a data room for prospective bidders, which may be accessed after execution of the appropriate confidentiality agreement. The Debtor believes that it has identified those persons who could be interested in presenting a bid, all of whom will be provided notice of the hearing on this Motion.  The Debtor believes that an expedited sale process is necessary to realize the highest value for the Purchased Assets and that the Sale is in the best long-term interest of the Debtor's customers, vendors and employees.  Accordingly, the Debtor requests a special setting of the Sale Hearing in order that the Debtor can provide notice of the hearing on the Sale Motion and the Assumption Motion as proposed herein.

25.     The Debtor believes the proposed sale to Buyer is in the best interest of creditors.  It is anticipated that the majority of the Debtor's employees will be offered employment by Buyer. The assumption and assignment of many of the Debtor's unexpired leases and executory contracts will reduce overall claims against the Debtor.  The Debtor believes that the Sale pursuant to the Bid Procedures will allow the Debtor to maximize the value of the Purchased Assets.

### III.     THE MOTION

**A.     Bidding Procedures.**

26.     As an inducement to Buyer to agree to enter into the Purchase Agreement subject to third party diligence and bidding, and in order that the sale process will not be delayed by last minute offers, the Debtor believes that the Court should establish a competing bid procedure concerning bids by any other prospective buyers.  The Debtor submits that the proposed Bid Procedures described in **Exhibit "A"** attached hereto and incorporated herein by reference are reasonable and necessary under the circumstances and will facilitate the consummation of an orderly sale and maximize the value of the Purchased Assets for the Debtor's Chapter 11 estate.

**B.     Breakup Fee.**

27.     If the Purchased Assets are sold to a purchaser other than Renwood, the Purchase

Agreement obligates the Debtor to pay to Renwood at the closing the Breakup Fee. Buyer has continued to incur costs and will incur additional costs through the closing date.

28.     The circumstances under which damages are payable to Buyer and the factual basis upon which the Debtor determined the provision was reasonable are set forth in the Kaelin Declaration.

**C.     Scheduling of Sale Hearing.**

29.     In furtherance of the Sale, the Debtor requests that the Sale Hearing (to include both the Sale Motion and the Assumption Motion) be scheduled by the Court for on or before September 29, 2011.  As discussed above, the Company's financial situation also requires that the Sale close as soon as possible.  Based on the extensive marketing of the opportunity over the past months, the Debtor also does not believe that additional time will yield any additional bids.  Based on the executory contracts and unexpired leases scheduled by the Debtor, there are also potentially approximately 25-50 parties to executory contracts and unexpired leases who may be impacted by the request for a hearing on shortened time.  If any particular issues arise regarding adequate protection or disputes over cure amounts (which are not anticipated), the Debtor is confident that such issues can be addressed in a timely fashion in order that the Sale may close as contemplated.

30.     In connection with the Sale, the Debtor requests that the Court establish the dates and manner of service for various notices.  The Debtor also requests that the Court establish certain objection deadlines including the date by which persons must object to the Debtor's proposed cure amounts in connection with the proposed assumption and assignment of executory contracts and unexpired leases.

**D.     Provisions for Notice and Objection Dates.**

31.     **Notices**.  Debtor requests authority to utilize the service lists maintained by its bankruptcy counsel for all mailings pertaining to the Sale.  As set forth in the Kaelin Declaration, Murray & Murray regularly updates its mailing lists based on return mailings, requests for special notice, proofs of claim filed in the case, among other updates.  B.L.R. 2002-1(c) requires use of a "current mailing list."  Debtor submits that use of Murray & Murray's most current service lists for all sale related notices satisfies this requirement.  In addition to the Court-appointed notice agent, the

DAK                                                                    8
S:\Android\co\...\v3.doc

Case: 11-48963   Doc# 37   Filed: 08/24/11   Entered: 08/24/11 17:08:14   Page 13 of
22

MOTION TO APPROVE OVERBID PROCEDURES AND RELATED
MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTOR.

Debtor also requests authority to utilize such outside contractors as they may deem appropriate to handle the duplication of sale-related notices and other pleadings, and to handle the actual mailing to the persons as established by the Court's order on this Motion, utilizing the service lists maintained by Debtor's counsel. Payment to such third party contractor(s) will be subject to the cash collateral budget with the Buyer. The Debtor, through the notice agent or other outside contractors as appropriate, proposes to provide notice of hearing on sale related matters as provided below.

a. **Bid Procedures and Sale Motion**.

(i) As soon as practicable and not less than 21 days prior to the Sale Hearing, following entry of the Court's order on this Motion (the "Bid Procedures Order"), the Debtor proposes to serve notice of the Sale Hearing (the "Sale Notice") and a copy of the Bid Procedures Order (with the approved Bid Procedures), by first-class mail, postage-prepaid, to (i) any creditors' committee appointed in the case and its counsel; (ii) all entities that claim any lien on the Debtor's assets, including parties asserting PACA claims; (iii) all parties to executory contracts and unexpired leases which the Debtor may seek to assume and assign to the Successful Purchaser (as defined in the Bid Procedures); (iv) all governmental taxing authorities that have, or as a result of the sale of any of the Debtor's assets may have, claims, contingent or otherwise, against the Debtor; (v) all parties that filed requests for notices or have appeared under Bankruptcy Rules 2002 and/or 9010(b); (vi) all interested governmental and pension entities; (vii) the Office of the United States Trustee; (viii) Buyer's counsel; (ix) to the extent practicable, all entities which within the 12 months prior to the Petition Date have expressed to the Debtor an interest in purchasing any of the Purchased Assets; and (x) any other persons designated by the Buyer (the "Sale Mailing List").

(ii) Not later than twenty-one days prior to the Sale Hearing, in addition to the Sale Mailing List, the Debtor shall cause the Sale Notice to be sent by first-class mail, postage-prepaid, to persons on the Debtor's creditor matrix, all persons who have filed proofs of claim, and persons who have filed a request for special notice in the case.

b. **Assumption Motion**. In connection with the Sale Motion, the Debtor will file the Assumption Motion which seeks authority to assume and assign to the Successful Bidder at the Sale Hearing, the Assumed Contracts pursuant to the Purchase Agreement. The notice of hearing on

DAK
S:\...\Android\...\Pleadings\Motion to Approve over-bid procedures\Motion v3.doc

Case 1:11-48963 Doc# 37 Filed: 08/24/11 Entered: 08/24/11 17:08:14 Page 14 of 22

MOTION TO APPROVE OVERBID PROCEDURES AND RELATED MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTOR.

the Assumption Motion (the "<u>Assumption Notice</u>") will provide the Debtor's intention to assume and assign the Assumed Contracts of the non-debtor parties and will include a schedule setting forth the cure amounts as determined by the Debtor (the "<u>Cure Amounts</u>").   The Debtor proposes to serve the Assumption Notice by first class mail on the persons on the Sale Mailing List not less than twenty-one (21) days prior to the Sale Hearing.

32.   **Moving Papers (Bid Procedures, Sale Motion and Assumption Motion)**.

Following approval of this Motion, the Debtor shall cause, not less than twenty-one (21) days before the Sale Hearing, service of the pleadings in support of the Sale Motion (which shall include as an exhibit, the Purchase Agreement (excluding any confidential exhibits or schedules), the Assumption Motion, and all declarations in support thereof, by first class mail upon (a) the Office of the United States Trustee for the Northern District of California, Oakland Division; (b) counsel for Buyer; (c) any creditors' committee and its counsel; (d) all entities (or counsel therefor) known to have asserted any lien, claim, encumbrance, right of refusal, or other property interest in or upon the Debtor or the Purchased Assets, including parties with PACA claims; (e) all parties that have expressed a bona fide interest in acquiring the Purchased Assets or that the Debtor believes may be interested in proposing a competing bid upon the Purchase Assets of the Company; (f) the Internal Revenue Service and all state and local taxing authorities; (g) all entities who have filed a notice of appearance and request for service of papers in these cases; and (h) all non-debtor parties to the Assumed Contracts.

33.   **Objection Bar Dates**.

a.   **To Asset Sale**.  The Debtor requests, pursuant to Fed. R. Bankr. P. 9014, that objections, if any, to the Sale, must:  (a) be in writing; (b) comply with the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules; (c) be filed with the Clerk of the Bankruptcy Court for the Northern District of California, Oakland Division, 1300 Clay Street, 3rd Floor, Oakland, California 94612, on or before seven (7) days prior to the Sale Hearing, and (d) be served no later than seven (7) days prior to the Sale Hearing upon (1) Debtor's counsel, John Walshe Murray of Murray & Murray, A Professional Corporation, 19400 Stevens Creek Boulevard, Suite 200, Cupertino, CA 95014, facsimile (650) 852-9244, email: jwmurray@murraylaw.com; (2)

counsel for the Buyer, Jeanette L. Thomas of Perkins Coie LLP, 1120 N.W. Couch Street, Tenth

Floor, Portland, OR 97209, facsimile (503) 346-2075; email: jthomas@perkinscoie.com; (3) the

Office of the United States Trustee, Attn: Lynette Kelly, 1301 Clay Street, Suite 690N, Oakland, CA

94612, facsimile (510) 637-3220; email: lynette.c.kelly@usdoj.gov; and (4) counsel for any

creditors' committee appointed in the case (the foregoing are collectively referred to as the "Service

Parties").

        b.    **To Assumption and Cure Amounts**.  The Debtor further requests that the

non-debtor parties to the Assumed Contracts have until seven (7) days prior to the Sale Hearing (the

"Cure Bar Date") (a) to object to the assumption and assignment of any of the Assumed Contracts,

or (b) object to the amount of the Cure Amounts, or (c) to assert that non-monetary defaults,

conditions or pecuniary losses or other amounts must be cured or satisfied (including all

compensation for any pecuniary loss resulting from a default in respect of the Assumed Contracts)

under any of the Assumed Contracts in order for such Assumed Contracts to be assumed and

assigned.  Such party must file and serve an objection upon the Service Parties (the "Assumption

and/or Cure Objection") setting forth (i) the basis for the objection (non-monetary or otherwise),

and, if applicable, (ii) the amount the party asserts as the cure amount and/or the amount of all

compensation for any actual pecuniary loss resulting from a default in respect of the Assumed

Contracts (with appropriate documentation in support thereof).  If no objection is received by the

Cure Bar Date, the Cure Amounts attached to the Assumption Notice shall be controlling as to the

amount necessary to be paid to cure under § 365(b)(1)(A) and (B) notwithstanding anything to the

contrary in any Assumed Contract or other document, and the non-debtor party to the Assumed

Contract shall be forever barred from asserting any claims for the Cure Amount, including any other

defaults, but not limited to pecuniary losses, that otherwise might or should have been asserted by

the non-debtor party to the Assumed Contracts, against the Debtor, Buyer or such other purchaser of

the Purchased Assets, through the effective date of the assumption and assignment in respect of such

Assumed Contract, and each party to any Assumed Contracts shall be deemed to have consented to

the assumption and assignment of the Assumed Contract to Buyer or any other purchaser of the

Purchased Assets, subject to Paragraph 33-c below.

DAK
S:\...\Android\...\02\Over-bid procedures\Mot v3.doc
11

MOTION TO APPROVE OVERBID PROCEDURES AND RELATED
MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTOR.

Case: 11-48963   Doc# 37   Filed: 08/24/11   Entered: 08/24/11 17:08:14   Page 16 of 22

c.       Notwithstanding anything herein to the contrary, if any non-debtor party to an Assumed Contract is not satisfied with the showing of adequate assurance of future performance by any competing bidder (other than Buyer) by the Sale Hearing, than the non-debtor party shall have the right to raise that objection to the Assumption Motion prior to the Auction at the time of the Sale Hearing.

## IV.       ARGUMENT

### A.       This Court Should Approve the Proposed Bid Procedures Because the Procedures Are Fair, Reasonable And In The Best Interests of Debtor's Estate.

34.       Bankruptcy Code § 363(b) and Rule 6004 of the Federal Rules of Bankruptcy Procedure authorize a debtor to sell assets of the estate other than in the ordinary course of business, after notice and a hearing.  See, e.g., Otto Preminger Films, Ltd. v. Qintex Entertainment, Inc. (In re Qintex Entertainment, Inc.), 950 F.2d 1492, 1495 (9th Cir. 1991).  In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside of the ordinary course of business may be by private sale or public auction.  See Fed. R. Bankr. P. 6004(f)(1).  Here, the Debtor believes that its ability to select the highest and best bidder at a Court-supervised auction enhances and benefits the marketing process by providing a motivation for bidders to submit a qualified bid with a high market value.

35.       Among the bid procedures commonly approved by bankruptcy courts is the requirement that a competing bid exceed the stalking horse purchaser transaction by a specified minimum amount.  The Bid Procedures will help the Debtor obtain the highest and best possible price for the Purchased Assets.  The initial bid by an Acceptable Bidder (defined in the Bid Procedures) must include the Purchase Price, plus $600,000 representing the Breakup Fee, plus the an initial overbid increment of $250,000 cash (the "Minimum Initial Bid").  The Minimum Initial Bid requirement protects the estate from the Breakup Fee of Buyer (discussed below) and costs associated with the transaction.  The Bid Procedures also require $100,000 cash increments at the Auction (the "Overbid Increment").  While the Overbid Increment represents .5% of Buyer's offer (with an estimated gross value of $20,000,000), which is less than the minimum overbid of five percent (5%) set forth under the GUIDELINES FOR EARLY DISPOSITION OF ASSETS IN CHAPTER 11 CASES promulgated by the Bankruptcy Court, Northern District of California, the Debtor believes

the Overbid Increment is appropriate for this case and will encourage meaningful overbids. The Debtor has also reserved the right in the Bid Procedures to modify the increment requirement at the Auction.

36. Sellers of assets often employ bidding protections in order to encourage the making of bids. Break-up fees and other arrangements, such as those proposed here, are "important tools to encourage bidding and to maximize the value of the debtor's assets." Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992), app. dism. on jurisdictional grounds 3 F.3d 49 (2d Cir. 1993).

37. Historically, bankruptcy courts have approved bidding incentives similar to the Breakup Fee under the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. See, e.g., In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted); see also In re Integrated Resources, Inc., 147 B.R. at 657-58 (establishing three basic factors for determining whether to permit break-up fees in bankruptcy: whether "the relationship of the parties who negotiated the break-up fee [is] tainted by self-dealing or manipulation," whether the "fee hamper[s], rather than encourage[s], bidding," and whether "the amount of the fee [is] unreasonable relative to the proposed purchase price"); In re Hupp Indus., Inc., 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) (identifying certain factors to be considered in determining the propriety of bid protections); but see In re America West Airlines, Inc., 166 B.R. 908, 912 (Bankr. D. Ariz. 1994) (concluding that the standard is not whether a break-up fee is within the business judgment of the debtor, but instead, whether the transaction will "[f]urther the diverse interests of the debtor, creditors and equity holders, alike").

38. "It has become increasingly common in section 363 sales of significant portions of an estate's assets for the prospective buyer to demand a breakup fee or other protection in the event that the sale is not consummated." In re Bethlehem Steel Corp., 2003 U.S. Dist. LEXIS 12909, at *30 (S.D.N.Y. July 28, 2003) (quoting 3 Collier on Bankruptcy ¶ 363.03[7] (15th ed. 2002)); see also 3

DAK
SF\Androh\600\600-bid procedures\Mot v3.doc

13

MOTION TO APPROVE OVERBID PROCEDURES AND RELATED MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTOR.

1    <u>Collier on Bankruptcy</u> ¶ 363.02[7] (15th ed. rev. 2009).  Courts which limit or deny such break-up

2    fees do so not because they lack statutory authority, but because they find the fee or amount is not in

3    the best interests of the various parties and/or the estate.  <u>In re Bethlehem Steel Corp.</u>, 2003 U.S.

4    Dist. LEXIS 12909, at *30; <u>see also</u> <u>Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien</u>

5    <u>Envtl. Energy, Inc.)</u>, 181 F.3d 527 (3d Cir. 1999) (denying § 503 claim for break up fee); <u>In re APP</u>

6    <u>Plus, Inc.</u>, 223 B.R. 870 (Bankr. E.D.N.Y. 1998) (denying topping fee).

7        39.      In a 2009 publication by the American Bankruptcy Institute on 363 sales nationally in

8    which 60 sale transactions were reviewed and analyzed, with respect to those sales that had a

9    breakup fee, topping fee and/or expense reimbursement, the authors report the following:  "Based on

10   our analysis, the amounts of the break-up and topping fees approved by the courts ranged from as

11   little as $150,000 to as much as $55 million, depending on the overall size of the sale transaction.

12   The amounts of such fees as a percentage of the stalking-horse proposed purchase price ranged from

13   1.25-5 percent, with the average being approximately 2.7 percent."[4]

14        40.      An informal survey of 363 sales in the Northern District of California reveals

15   allowance of a breakup fee and/or expense reimbursement have generally ranged between one and

16   five percent depending on the size of the transaction.[5]

17

18      [4]  <u>See</u> Kelly K. Frazier, A COMPARISON SHOPPING GUIDE FOR 363 SALES (2009) at p. 139 and
Exhibit 5.2.1.  For the Court's convenience, a copy of these referenced pages are attached to the Kaelin

19   Declaration as Exhibit "A."

20      [5]  <u>See, e.g.</u>, <u>In re Impeva Labs, Inc.</u>, Case No. 10-53056 (purchase consideration of $2 million in cash
and $690,000 in assumed liabilities, with expense reimbursement not to exceed $150,000 (representing 5% of

21   the value of the transaction); <u>In re Aviza Technology, Inc.</u>, Case No. 09-54511 (lead case in three jointly
administered cases)(value of purchase price estimated at $50 million, with expense reimbursement not to

22   exceed $1 million (representing 2% of the estimated gross proceeds of sale); <u>In re RedEnvelope</u>, Case No. 08-
30659 (stalking horse bid of $5.7 million, with breakup fee of $256,500 (representing 4.5% of the purchase

23   price); <u>In re The Legacy Estate Group LLC, a California limited liability company, dba Freemark Abbey</u>
<u>Winery, Byron Vineyard & Winery, and Arrowood Vineyards & Winery</u>, Case No. 05-14659 (purchase price

24   of $90 million, with breakup fee of $900,000 (representing 1% of the purchase price); <u>In re Commerce One,</u>
<u>Inc.</u>, Case No. 04-32820 (lead case in two jointly administered cases)($4.1 million initial bid (credit bid), plus

25   commitment to fund $50,000 in payroll, with breakup fee of $175,000 (representing 4.2% of the total sale
consideration); <u>In re Chevys Inc.</u>, Case No. 03-45879 (purchase price of $77.9 million, with expense

26   reimbursement of $1.5 million (1.9%)); <u>In re Clarent Corp.</u>, Case No. 02-33504 (purchase price of $9.8
million, with expense reimbursement of $550,000 (5.6%)); <u>In re Sanrise, Inc.</u>, Case No. 02-43167 (purchase

27   price of $2.5 million, with a breakup fee of $100,000 (4%) and expenses of $75,000 (3%)); <u>In re Merchant</u>
<u>Land Fund I</u>, Case No. 02-43663 (two stalking horse bidders in $26-$27 million transaction, second breakup

28   fee was twice actual costs, with a cap of $1 million (up to 3.7%)); <u>In re Calico Commerce, Inc.</u>, Case No. 01-
56101 (break-up fee and expenses fixed at $250,000, representing 5% of the initial purchase price); <u>In re Site</u>

DAK
S:\Androhit\os\fp\Mtn\ over-bid procedures\Mtn v3.doc

-14-

MOTION TO APPROVE OVERBID PROCEDURES AND RELATED
MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTOR.

Case: 11-48963   Doc# 37   Filed: 08/24/11   Entered: 08/24/11 17:08:14   Page 19 of
22

41.     The Debtor has formulated a bidding process that is fair and reasonable in view of the transaction size and type and which the Debtor believes will induce prospective competing bidders to present a bid.  The Breakup Fee, representing 3% of the Purchase Price, is consistent with the range of breakup fees typically approved.

42.     The Breakup Fee is also fair and reasonable in amount in view of Buyer's efforts to date and the risks associated with being a "stalking horse."  These factors include the requirement of a number of transition and ancillary documents pertaining to the contemplated transactions, among other issues.  The Breakup Fee benefits the estate because it assists in maximizing the value to the estates by facilitating a sale of the Debtor's business assets as a going concern rather than in a "fire sale" liquidation which might occur in the absence of Buyer's offer.  See In re O'Brien Envtl. Energy, Inc., 181 F.3d at 537 (explaining that a break-up fee could be found to be a benefit to the estate where "assurance of a break-up fee promoted more competitive bidding").

43.     The Debtor does not believe that the amount of the Breakup Fee is so substantial so as to chill other potential bidders from submitting competing bids.  Rather, the amount is reasonable compared to the total consideration under the Purchase Agreement and will only be paid if the assets are sold to a bidder other than Buyer necessarily providing greater value for the Purchased Assets. Even in the absence of the Breakup Fee, an incremental amount would be appropriate to assure that the Debtor is dealing with only serious bidders with the financial ability to complete a transaction without delay.

44.     Further, the Breakup Fee has arguably already encouraged competitive bidding, in that Buyer would not agree to negotiate and execute the Purchase Agreement without this provision. The Breakup Fee thus has "induc[ed] a bid that otherwise would not have been made and without which bidding would [be] limited."  See In re O'Brien Envtl. Energy, Inc., 181 F.3d at 537. Similarly, Buyer's offer provides a minimum bid on which other bidders can rely, thereby "increasing the likelihood that the price at which the [assets will be] sold will reflect [their] true worth."  Id.  Finally, the mere existence of the Breakup Fee permits the Debtor to insist that

---

Technologies, Inc., Case No. 99-50736 (approved break-up fee was buyer's reasonable costs and expenses not to exceed 5% of the purchase price).

Case 11-43963    Doc# 37    Filed: 08/24/11    Entered: 08/24/11 17:08:34    Page 20 of

competing bids for the Debtor's assets be sufficiently higher than that being offered by Buyer, a clear benefit to the Debtor's estate.

45. Protection of opening bidders is the price paid for a debtor's enjoyment of the best of both worlds - the assurance of a contractually bound purchaser at a fair price, on the one hand, and at the same time the potential of an even better bid with the corresponding enhanced benefit to the estate. The Debtor's ability to offer the Breakup Fee enables it to ensure the sale of the Debtor's assets to a contractually-committed bidder. Under the circumstances, the Debtor believes the Breakup Fee is reasonable and should be approved.

46. The Debtor believes that the foregoing Bid Procedures and the Breakup Fee are fair, reasonable, and are appropriately structured to ensure that the Debtor will obtain the best offer for the Purchased Assets. The proposed Bid Procedures allow the Debtor to maximize the value of the Purchased Assets while also ensuring that (a) only legitimate overbids are received from entities interested in purchasing Debtor's interest in the Purchased Assets; and (b) any overbid is sufficient to cover the Breakup Fee required to be paid to Buyer if an overbid is accepted and the sale consummated. The Debtor further believes, in its reasoned business judgment, that the proposed sale (subject to the Bid Procedures) is in the best interests of the estate and creditors because it will maximize the value of the Debtor's assets.

**WHEREFORE**, the Debtor respectfully requests that the Court enter its order as follows:

1. Granting the Motion;

2. Designating Buyer as the Stalking Horse Purchaser;

3. Approving the Bid Procedures as set forth on **Exhibit "A"** hereto;

4. Approving the Breakup Fee as set forth herein;

5. Scheduling the hearing on the Sale Motion (including the Auction) and the Assumption Motion for a date on or before September 29, 2011;

6. Authorizing the Debtor to use the service lists maintained by its bankruptcy counsel for all mailings contemplated hereunder (rather than the Court's mailing matrix) in satisfaction of the requirements of Bankruptcy Local Rule 2002-1(c); and providing further, the Debtor may use (in addition to the court appointed notice agent) an outside copy service of their choosing to handle the

DAK
S:\...\Androhit\...\...\bid_procedures\mot v3.doc

16

Case 2:11-48963   Doc# 37   Filed: 08/24/11   Entered: 08/24/11 17:08:14   Page 21 of 22

MOTION TO APPROVE OVERBID PROCEDURES AND RELATED MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTOR.

duplication and mailing of all pleadings to be mailed in connection with the Sale, utilizing the service lists maintained by Debtor's counsel. Payment to any such outside service company utilized by the Debtor shall be in accordance with the Debtor's cash collateral budget with Buyer;

7.    Shortening time with respect to service of the Sale Notice, the Sale Motion (and related declarations), the Assumption Motion, and the Assumption Motion (and related declarations) to not less than twenty-one (21) days notice prior to the Sale Hearing;

8.    Approving the manner of notice and service of the other pleadings as proposed at Paragraphs 31 and 32 herein and determining that such notice and manner of service is adequate and reasonable under the circumstances;

9.    Shortening time such that the Cure Bar Date and the deadline for objections to the Sale Motion and the Assumption Motion shall be seven (7) days prior to the Sale Hearing; and

10.    For such other and further relief as the Court deems appropriate.

Dated: August 24, 2011

**MURRAY & MURRAY**
A Professional Corporation


By:  */s/ Doris A. Kaelin*
       Doris A. Kaelin
       Attorneys for Debtor

DAK
S:\Andronico's\Plan\Over-bid procedures Mot v3.doc
Case: 11-48963  Doc# 37  Filed: 08/24/11  Entered: 08/24/11 17:08:14  Page 22 of 22