JOHN WALSHE MURRAY (074823)
DORIS A. KAELIN (162069)
THOMAS T. HWANG (218678)
MURRAY & MURRAY
A Professional Corporation
19400 Stevens Creek Blvd., Suite 200
Cupertino, CA 95014-2548
Telephone: (650) 852-9000; (408) 907-9200
Facsimile: (650) 852-9244
Email: jwmurray@murraylaw.com
Email: dkaelin@murraylaw.com
Email: thwang@murraylaw.com

Attorneys for Debtor

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

In re:

**ANDRONICO'S MARKETS, INC.,**
A California Corporation, aka
Andronico's Community Markets,

    Debtor.

1200 Irving Street
San Francisco, CA 94122

Employer Tax I.D. No.: 94-1307395

Case No. 11-48963-EDJ-11

Chapter 11

Date:    September 20, 2011
Time:    10:30 a.m.
Place:   United States Bankruptcy Court
           1300 Clay Street, Courtroom 215
           Oakland, CA 94612
Judge:  Honorable Edward D. Jellen

**DECLARATION OF WILLIAM R. BRINKMAN IN SUPPORT OF MOTION FOR ORDER (1) MODIFYING BID PROCEDURES, AND (2) AMENDING BID PROCEDURES ORDER**

I, William R. Brinkman, declare:

1. I am a principal of Bailey, Elizondo & Brinkman LLC ("BEBLLC"), the proposed financial advisor for Andronico's Markets, Inc., the debtor and debtor in possession in the above-captioned bankruptcy case ("Andronico's," the "Company" or the "Debtor"), and am authorized to make this Declaration on behalf of the Debtor. I have personal knowledge of the matters stated herein except as to those matters stated on information and belief, and as to those matters I am informed and believe them to be true. If called as a witness, I could and would testify competently

as to those matters.

2. I submit this Declaration in support of the MOTION FOR ORDER (1) MODIFYING BID PROCEDURES, AND (2) AMENDING BID PROCEDURES ORDER (the "Motion").

3. At the time the Bid Procedures[1] were approved and the Bid Procedures Order was entered, the Debtor and Renwood had not yet reached final agreement on the terms of the Purchase Agreement.

4. After extensive negotiations, the Debtor and Renwood reached agreement on the final terms of the Purchase Agreement. On September 16, 2011, the Debtor and Renwood executed the Purchase Agreement subject to Court approval of the Sale following the opportunity for overbids.

5. The Bid Procedures presently do not harmonize with the final terms of the Purchase Agreement. Specifically, the Purchase Price (as defined in the Purchase Agreement) has been reduced from $20 million to $16 million. Consequently, the Debtor requires modification to the Bid Procedures in order to accurately reflect the Purchase Price and the corresponding reduced initial minimum bid.

6. I am informed and believe and on that basis allege that the relief requested in the Motion is reasonable under the circumstances. The Debtor and Renwood have negotiated in good faith to finalize the Purchase Agreement, and the relief requested in the Motion is necessary so that the Bid Procedures and the Bid Procedures Order will accurately reflect the terms of the Purchase Agreement.

7. The Debtor has utilized the services of BEBLLC since October 2010 to serve as its financial and restructuring advisor to assist the Company in the evaluation of restructuring alternatives, negotiation with the its lenders, and in canvassing the marketplace for potential investors or buyers. BEBLLC does not believe that the reduction of the Purchase Price will be detrimental to the auction process or to the proposed Sale.

8. During the post-petition period, BEBLLC has updated and refreshed the sale marketing materials, updated the online data room, and created a proposed transaction summary, a

---

[1] Capitalized terms not defined herein shall have the meaning ascribed in the Motion.

"teaser", that was emailed during the week of September 5, 2011 to approximately 1,500 potential investors, capital sources, and advisors, who are BEBLLC contacts from its proprietary database, a true and correct copy of the "teaser" is attached hereto as **Exhibit "A"** and incorporated herein by reference. The 46 prospective candidates, excluding those who asked to be removed from the list, were also emailed the teaser. BEBLLC has been actively responding to inbound inquiries from potential bidders as a result of the teaser email and general inquiries stemming from the publicity generated by the Chapter 11 filing. Although approximately 15 new candidates have indicated some level of interest stemming from the teaser marketing efforts, only three have executed non-disclosure agreements, and one of those is a retail and equipment liquidator. BEBLLC anticipates at least two more candidates will execute non-disclosure agreements.

9. With respect to those persons who have indicated interest in the possibility of presenting a bid, BEBLLC is in the process of communicating with such persons with the new Purchase Price and to respond to any questions or concerns by such potential bidders. BEBLLC has prepared a supplement to the teaser based on the reduced Purchase Price, a true and correct copy of which is attached hereto as **Exhibit "B"** and incorporated herein by reference, which will be emailed to all persons who received the original teaser (excluding those persons who requested removal from the list, duplicates and the like).

10. BEBLLC has contacted via telephone a majority of the initial 25 candidates that executed non-disclosure agreements to inquire if they had any continuing interest in pursuing the acquisition of Andronico's, and none of the 25 contacted indicated that they intended to submit bids for one or more stores. However, two of the 25 contacted stated that they are continuing to evaluate the opportunity and may make a bid to purchase certain stores. BEBLLC anticipates that inquiry, and potentially due diligence, will continue for the next couple of weeks. One of the comments that candidates consistently made to BEBLLC when asked what drove the candidate's decision to not bid was that the stalking horse bid—assumed to be $20 million for substantially all of the company's assets—was too high of a purchase price. Further, many of these same candidates stated that they believed that the stalking horse bidder would raise its own bid, if a competitive auction process was to occur, and likely outbid any competitive bid by credit bidding more of the stalking horse bidder's

Case: 11-48963  Doc# 178-1  Filed: 09/19/11  Entered: 09/19/11 20:51:08  Page 3 of 5

3

DECLARATION OF WILLIAM R. BRINKMAN IN SUPPORT OF MOTION FOR ORDER (1) MODIFYING BID PROCEDURES, AND (2) AMENDING BID PROCEDURES ORDER

secured debt position.

11. I believe that the most likely potential buyers of Andronico's assets—in whole or in parts—are aware of the Section 363 sale process. Further, I believe that generally the market as a whole has concluded that a stalking horse bidder may raise its bid up to the full amount of the prepetition secured debt, which is approximately $29 million, plus up to $5 million related to the DIP Credit Facility. As a result, it is my opinion that potential bidders are still not likely to submit a bid if the stalking horse bid is reduced from $20 million to $16 million. Thus, I have concluded that the decrease of the stalking horse bid to $16 million will not have a meaningful impact, positively or negatively, on potential bidders.

12. Based on the extensive marketing of the opportunity prior to the Petition Date (commencing in February 2011) and continuing into the bankruptcy case, I do not believe prolonging the auction process would result in additional bids.

13. It is critical that the Sale go forward as scheduled on October 13, 2011. The Purchase Agreement requires the Debtor to close the Sale by October 21, 2011. Renwood has repeatedly indicated to me that a critical component of its business plan includes the preparation and execution of the sales, marketing, and merchandising plan targeting the holiday seasons in November and December. Therefore, a closing as soon as possible in October is critical to Renwood, and is anticipated to be critical to other bidders, because of the seasonal nature of the business (November and December being the busiest months for the business). Consequently, postponement of the Sale Hearing may render the Sale less attractive to potential bidders.

14. In connection with the Purchase Agreement and the Sale, and pursuant to the DIP Credit Agreement and approval by the Court, the Debtor is authorized to use cash collateral and borrow up to $5 million in the DIP Credit Facility provided by Renwood to provide ongoing working capital to the Debtor pending the Sale. The Debtor is reliant on the DIP Credit Facility to fund its operations. Any delay in the closing the Sale would cause the estate to incur additional cost and would be detrimental to the estate. Further, the milestones in the DIP Credit Facility require that the Debtor adhere to agreed upon timeframes on which to complete certain activities and actions. Among these milestones is that the Court enter orders granting the Sale Motion and Assumption

TTH
K:\Andronico's\PR\Mot-bid procedures\Amend.doc WRB-v2.docx

4

DECLARATION OF WILLIAM R. BRINKMAN IN SUPPORT OF MOTION FOR ORDER (1) MODIFYING BID PROCEDURES, AND (2) AMENDING BID PROCEDURES ORDER

Motion on or before October 13, 2011, and the Sale must close on or before October 21, 2011. The DIP lender informed the Debtor, on September 17, 2011, that it failed to meet one of the required Borrower Milestones which required that the filing of the Sale Motion and the Assumption Motion by September 6. The DIP lender subsequently informed the Debtor that the DIP lender does not consent to any payments other than those related to operations until the Borrower cures the defaults. If the DIP lender were to restrict the Debtor's access to the DIP Credit Facility to fund operations, it is unlikely that the Debtor would be able to operate.

15. Based on my review of the DIP Credit Facility, the DIP Credit Facility matures at the earliest of: (a) October 31, 2011, (b) the effective date (b) the effective date of a plan of reorganization or liquidation for Borrower, (c) the date that is 30 days after entry of the Interim Financing Order if the Final Financing Order has not been entered by that date, (d) the sale of a material portion of the Borrower's assets in one or more transactions under Section 363 of the Bankruptcy Code, or (e) the due date determined pursuant to Section 8.2 of the DIP Credit Agreement. If the sale of the Debtor's assets is delayed, the DIP Credit Facility may expire and may not be available to the Debtor to fund its operations. Accordingly, I believe that any delay of the Sale Hearing will likely be detrimental to the Debtor's customers, vendors and employees, and to the estate as a whole.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this Declaration is executed on September 19, 2011.

*/s/ William R. Brinkman*
William R. Brinkman

Case: 11-48963   Doc# 178-1   Filed: 09/19/11   Entered: 09/19/11 20:51:08   Page 5 of 5

DECLARATION OF WILLIAM R. BRINKMAN IN SUPPORT OF MOTION FOR ORDER (1) MODIFYING BID PROCEDURES, AND (2) AMENDING BID PROCEDURES ORDER

5