JOHN WALSHE MURRAY (074823)
DORIS A. KAELIN (162069)
THOMAS T. HWANG (218678)
MURRAY & MURRAY
A Professional Corporation
19400 Stevens Creek Blvd., Suite 200
Cupertino, CA 95014-2548
Telephone:  (650) 852-9000; (408) 907-9200
Facsimile:  (650) 852-9244
Email:  jwmurray@murraylaw.com
Email:  dkaelin@murraylaw.com
Email:  thwang@murraylaw.com

Attorneys for Debtor

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

In re:

**ANDRONICO'S MARKETS, INC.,**
A California Corporation, aka
Andronico's Community Markets,

Debtor.

1200 Irving Street
San Francisco, CA 94122

Employer Tax I.D. No.: 94-1307395

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 11-48963-EDJ-11

Chapter 11

Date:      October 13, 2011
Time:      9:00 a.m.
Place:     United States Bankruptcy Court
           1300 Clay Street, Courtroom 215
           Oakland, CA  94612
Judge:     Honorable Edward D. Jellen

**MOTION BY DEBTOR TO SELL CERTAIN ASSETS**
**FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS**

**Proposed Purchaser:**          **Renwood Andronico Lending 1, LLC, a Delaware limited liability**
                                 **company (or its designee) ("Renwood"), subject to higher and**
                                 **better bids.**

Case: 11-48963    Doc# 184    Filed: 09/20/11    Entered: 09/20/11 19:05:30    Page 1 of 38

**Potentially Affected Lien, Claim, and Interest Holders:**

ALL PERSONS PROVIDED NOTICE OF THE SALE, INCLUDING, BUT NOT LIMITED TO, PERSONS LISTED AS CREDITORS ON THE DEBTOR'S SCHEDULES OR WHO HAVE FILED A PROOF OF CLAIM OR REQUEST FOR NOTICE IN THE DEBTOR'S CASE.

*(ANY PERSON WHO DOES NOT KNOW IF THEY WERE LISTED AS A CREDITOR IN THE DEBTOR'S SCHEDULES MAY CHECK THE BANKRUPTCY SCHEDULES POSTED ON THE WEBSITE CREATED BY THE COURT-APPOINTED NOTICE AGENT (www.AndronicosMarketsRestructuring.com), OR YOU MAY CONTACT THE DEBTOR'S ATTORNEYS: Doris A. Kaelin or Thomas T. Hwang, via telephone at (650) 852-9000 or email at dkaelin@murraylaw.com or thwang@murraylaw.com.)*

AMERICAN BANK NOTE COMPANY

BANK OF THE WEST

DELL FINANCIAL SERVICES, L.P.

FIRST FEDERAL LEASING

PAWNEE LEASING CORPORATION

RENWOOD ANDRONICO LENDING 1, LLC

SPECIAL SITUATIONS INVESTING, INC.

THE CIT GROUP/EQUIPMENT FINANCING, INC.

UNIFIED GROCERS, INC.

US BANCORP[1]

**All Parties to Executory Contracts and Unexpired Leases Subject to Assumption and Assignment:**

**See separate** notice of hearing on MOTION TO AUTHORIZE DEBTOR TO ASSUME AND ASSIGN, OR ALTERNATIVELY REJECT, EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE OF CERTAIN OF ITS ASSETS (11 U.S.C. § § 363 AND 365) (the "Assumption Motion").

---

[1] American Bank Note Company filed a UCC-1 based on a sale agreement with respect to postage stamps. The Debtor has been unable to obtain a copy of the underlying agreement and therefore the legal relationship between the parties is still subject to review. The contract may be subject to assumption and assignment to the successful purchaser. Bank of the West and Special Situations Investing, Inc. held blanket liens prior to the Petition Date which were assigned upon the sale of the underlying debts to Renwood. Unified Grocers, Inc. asserts a security interest in certain certificates of shares held by the Debtor as a member-patron of Unified Grocers. In the event Unified Grocers is validly perfected, the Debtor will not move to sell free and clear of its lien and Renwood may elect to take the Purchased Assets subject to such interest or exclude it. The remaining persons listed have filed a UCC-1 with respect to specific equipment or other personal property. The Buyer intends to acquire substantially all of the Debtor's personal property. Any personal property included in the sale that is subject to a conditional sales contract, duly perfected by a UCC-1 filing, will be sold to Renwood subject to such lien(s). Equipment that is the subject of a true lease will not be sold but may be subject to assumption and assignment to the successful purchaser which is the subject of the separate Assumption Motion (as defined below) scheduled for hearing together with this motion. All UCC filings are discussed in greater detail in this motion commencing at Section V-C below.

The sale of assets (the "Sale") will be free and clear of all liens, claims, encumbrances and other interests in or to the Purchased Assets (as defined below) as provided by that certain ASSET PURCHASE AGREEMENT between Renwood and the Debtor dated September 16, 2011 (as it may be amended, the "Purchase Agreement"). Terms not separately defined herein shall have the meaning ascribed to them in the Purchase Agreement. A true and correct copy of the Purchase Agreement (excluding exhibits and schedules thereto) is attached to the Andronico Declaration (as defined below) as **Exhibit "A."** All exhibits referred to herein are incorporated herein by reference.

# TABLE OF CONTENTS

Page

I.  SUMMARY OF RELIEF ...................................................................................1

II.  INTRODUCTION ..........................................................................................2

III.  BACKGROUND SUMMARY .........................................................................2

IV.  PROPOSED SALE TO RENWOOD ................................................................6

    A.  Summary of Proposed Sale. ...............................................................6

    B.  Additional Information. ........................................................................8

        Alternatives to Sale and Auction; Marketing of Purchased Assets; Compensation Arrangement with BEBLLC ..............................8

        Asset Valuation ..............................................................................12

        Relationship to Renwood/Post-Sale Relationship with Renwood ...............................13

        Insider Compensation ....................................................................13

        Debt Structure of Debtor/Estimated Distribution of Proceeds ....................13

        Communications with Creditors and Shareholders ........................16

V.  ARGUMENT .................................................................................................17

    A.  The Sale Should Be Approved as Fair, Reasonable and in the Best Interest of Creditors and the Bankruptcy Estate .............................17

        i)  There Is a Valid Business Justification and Good Business Reason to Support the Sale. .............................18

        ii)  The Proposed Sale Is in Good Faith and Renwood or the Successful Overbidder Should Be Afforded the Protections of 11 U.S.C. § 363(m) ...........19

        iii)  The Purchase Price Is Fair and Reasonable. ...................................21

    B.  The Bid Procedures Established by the Court Will Encourage Meaningful Overbids on the Purchased Assets. ..........................................21

    C.  The Sale Satisfies the Requirements of Bankruptcy Code Section 363(f) for the Sale of the Estate's Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests....................22

    D.  The Proposed Sale Satisfies the Requirements of Bankruptcy Code Section 363(b)(1) Regarding the Sale of Personally Identifiable Information. ...................27

    E.  Name Change of Debtor .....................................................................29

F.    Accurate and Reasonable Notice Has Been Provided. ...............................................29

G.    Waiver of Federal Rule of Bankruptcy Procedure 6004(h) .........................................30

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

Page

## CASES

240 North Brand Partners, Ltd. v. Colony GFP Partners, L.P. (In re 240 North Brand
Partners, Ltd.), 200 B.R. 653 (9th Cir. B.A.P. 1996)......................................................17

In re Abbotts Dairies,
788 F.2d 143 (3rd Cir. 1986) ...............................................................17, 20, 21

In re Apex Oil Co.,
92 B.R. 847 (Bankr. E.D. Mo. 1988)..........................................................20

Arnold & Baker Farms v. United States.,
85 F.3d 1415 (9th Cir. 1996) ..............................................................21

In re Curlew Valley Assocs.,
14 B.R. 506 (Bankr. D. Utah 1981) ..........................................................19

In re Gulf States Steel, Inc. of Ala.,
285 B.R. 497 (Bankr. N.D. Ala. 2002) .................................................19, 21

Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re
Continental Air Lines, Inc.), 780 F.2d 1223 (5th Cir. 1986) ......................................18

In re Kabuto Ariz. Props., LLC,
2009 Bankr. LEXIS 4961 (Bankr. D. Ariz. Dec. 9, 2009)..........................................19

In re Lionel Corp.,
722 F.2d 1063 (2d Cir. 1983)...............................................................18

Otto Preminger Films, Ltd. v. Qintex Entertainment, Inc.(In re Qintex Entertainment, Inc.),
950 F.2d 1492 (9th Cir. 1991) .............................................................17

In re Southern Biotech, Inc.,
37 B.R. 318 (Bankr. M.D. Fla. 1983) ........................................................19

T.C. Investors v. Joseph (In re M Capital Corp.),
290 B.R. 743 (9th Cir. B.A.P. 2003).........................................................20

Walter v. Sunwest Bank (In re Walter),
83 B.R. 14 (9th Cir. B.A.P. 1988)...........................................................18

In re Wilde Horse Enterprises, Inc.,
136 B.R. 830 (Bankr. C.D. Cal. 1991)........................................................17

DAK
...and opinion (msw) Motion to sell                                iv       MOTION BY DEBTOR TO SELL CERTAIN ASSETS FREE AND CLEAR OF LIENS,
CLAIMS AND OTHER INTERESTS

Case 11-48963   Doc# 184   Filed: 09/20/11   Entered: 09/20/11 19:05:30   Page 5 of
38

## **STATUTES**

Bankruptcy Code § 363(b)..................................................................17, 18
   § 363(b)(1)...........................................................................................27
   § 363(f)..........................................................................................22, 31
   § 364(d)..............................................................................................22
   § 503(b)..............................................................................................22
   § 507(a)(2)..........................................................................................22
   § 1107..................................................................................................2
   § 1108..................................................................................................2

Cal. Comm. Code § 8106..................................................................26
   § 9106..................................................................................................26

## **OTHER AUTHORITIES**

3 Collier on Bankruptcy ¶ 363.02[4] (16th ed. rev. 2011).............17

Bankruptcy Local Rule 6004-1.............................................................1

11 U.S.C. § 363...............................................................1, 16, 21
   § 363(m)...................................................................19, 21, 31

28 U.S.C. § 157..................................................................................1
   § 157(b)(2)............................................................................................1
   § 1334..................................................................................................1
   § 1408..................................................................................................1
   § 1409..................................................................................................1

Federal Rules of Bankruptcy Procedure Rule
   § 363(b) ...............................................................................................1
   § 363 (f)...............................................................................................1
   § 6004..................................................................................................17
   § 6004(f)(1).........................................................................................17
   § 6004(h)..................................................................................2, 30, 31

Andronico's Markets Inc., a California corporation, the debtor and debtor in possession herein ("Andronico's", the "Company", or the Debtor), hereby submits its MOTION BY DEBTOR TO SELL CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS (the "Sale Motion"). The Sale Motion requests that the Court enter an order approving the sale of certain of the Debtor's assets (the "Purchased Assets") to Renwood subject to the submission of higher and better bids (the successful purchaser is hereinafter referred to as the "Successful Purchaser").[2]

The Court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The statutory predicate for the relief sought herein is 11 U.S.C. § 363. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.[3]

The Sale Motion is made pursuant to Sections 363(b) and (f), Federal Rules of Bankruptcy Procedure 2002 and 6004 and Bankruptcy Local Rule 6004-1. The Sale Motion is based on the memorandum of points and authorities below, the DECLARATION OF WILLIAM J. ANDRONICO IN SUPPORT OF MOTION BY DEBTOR TO SELL CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS (the "Andronico Declaration"), the DECLARATION OF WILLIAM R. BRINKMAN IN SUPPORT OF MOTION BY DEBTOR TO SELL CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS (the "Brinkman Declaration"), and the DECLARATION OF DORIS A. KAELIN IN SUPPORT OF MOTION BY DEBTOR TO SELL CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS (the "Kaelin Declaration"), all filed concurrently herewith, and on such other evidence and argument as may be submitted prior to or at the hearing on the Sale Motion (the "Sale Hearing").[4]

## I.     SUMMARY OF RELIEF

1.     The Debtor requests approval of its sale of the Purchased Assets to Renwood, subject

---

[2] The Bid Procedures (defined below) allow bids to be made on all or some of the assets. In the event a combination of bids is determined to be the highest and best bid, the reference to the Successful Purchaser herein shall encompass multiple purchasers as applicable.

[3] Unless otherwise specified herein, all statutory references are to Title 11 of the United States Code.

[4] In addition to other evidence as may be submitted in advance of or at the Sale Hearing, the Debtor anticipates the filing of a declaration by Renwood and such other persons who are Qualified Bidders providing evidence in support of the good faith finding requested by this Sale Motion.

to overbid, pursuant to the terms and conditions set forth in the Purchase Agreement.

2. The Sale is conditioned upon the assumption and assignment of certain executory contracts and unexpired leases of the Debtor (the "Assumed Contracts"). Additional details regarding the Assumed Contracts are set forth in the separate Assumption Motion which is scheduled for hearing on the same date and time as this Sale Motion.

3. The Debtor requests that the Sale be free and clear of liens, claims, encumbrances and other interests, as provided in the Purchase Agreement, including, without limitation, any claims relating or arising out of any collective bargaining agreement, health or welfare benefit plan or pension plan (including, without limitation, any "multiemployer plan," as defined in Section 3(37) or 4001(a)(3) of the Employee Retirement Income Security Act of 1974, as amended); with any such liens, claims, encumbrances or interests to attach to the proceeds of the Sale.

4. The Debtor also requests that the provision of Federal Rule of Bankruptcy Procedure 6004(h) that would otherwise stay any order approving the Sale as requested herein, be waived under the circumstances.

## II.     INTRODUCTION

5. Andronico's commenced this Chapter 11 case with the filing of its Voluntary Petition on August 22, 2011 (the "Petition Date") and is presently operating its business as a debtor in possession pursuant to the provisions of Bankruptcy Code Sections 1107 and 1108.

6. An Official Committee of Unsecured Creditors (the "Committee") was appointed by the Office of the United States Trustee on August 26, 2011 and is currently represented by counsel and a financial advisor.

## III.     BACKGROUND SUMMARY

7. Andronico's is a leading independent, specialty supermarket operator in the San Francisco Bay Area. Founded in 1929, the Company operates seven stores in prime upscale urban and suburban locations in Berkeley (four stores), Los Altos, San Anselmo, and San Francisco.

8. Following an ill-fated expansion strategy in the early 2000s when Andronico's opened three new locations, the Company closed all three of the new stores in 2006 after investing nearly $44 million into the projects. During the most recent economic downturn triggered by the

financial meltdown in 2008, Andronico's suffered from a decline in sales, erosion of margins, and a hindered balance sheet. These challenges led the Company in 2010 to recruit and hire a new executive team, comprised of experienced industry veterans who previously held leadership positions at Whole Foods Market and Safeway, and who were attracted to Andronico's significant brand equity and potential. Unfortunately, the new leadership was unable to turn around the Company and embark on a growth strategy which precipitated additional changes and a down-sizing of the management team. The team presently consists of chief executive officer William J. Andronico, a 35-year Company veteran, and Justin Jackson, executive vice-president of operations.

9. After substantial declines in sales during fiscal years 2008 and 2009, annual sales have stabilized over the past two fiscal years in the $115 million to $120 million range with gross margins in the range of 38% to 42%. The management team has also significantly reduced expenses, most notably corporate overhead, and closed its Palo Alto location that operated at a loss.

10. Andronico's is the borrower under that certain Credit Agreement between the Company and Bank of the West ("BOW") dated as of February 14, 2007 (as amended, the "BOW Credit Agreement") and the "Loan Documents" (as defined in the BOW Credit Agreement), such Loan Documents and the BOW Credit Agreement hereinafter collectively referred to as the "BOW Loan Documents." The outstanding balance under the BOW Loan Documents as of August 19, 2011 is $7,721,315.55, consisting of principal of $7,359,756.10, accrued interest of $16,559.45 and contingent liability for issued letters of credit of $345,000.00, and fee and expense reimbursement obligations of approximately $172,000.

11. Andronico's is also the borrower under that certain Second Lien Credit Agreement between Borrower and Special Situations Investing, Inc. ("SSI"), a wholly owned subsidiary of JPMorgan Chase & Co., dated as of February 14, 2007 (as amended, the "SSI Credit Agreement") and the "Loan Documents" (as defined in the SSI Credit Agreement), such Loan Documents and the SSI Credit Agreement hereinafter collectively referred to as the "SSI Loan Documents"). The outstanding balance under the SSI Loan Documents as of August 19, 2011 is $21,665,618.70, consisting of principal of $20,000,000, accrued interest of $1,665,618.70, and fee and expense reimbursement obligations of approximately $25,000.

12. On August 19, 2011, Renwood acquired all of the interests of BOW under the BOW Loan Documents and all of the interests of SSI under the SSI Loan Documents (the "Loan Acquisition"). Renwood is owned by Renwood Opportunities Fund 1, LLC and Renwood-Andronico's, LLC. Renwood is, therefore, the Debtor's senior secured creditor with a lien on substantially all of the Debtor's assets holding a claim of approximately $29 million (the "Pre-Petition Debt"). A summary of the Debtor's other debts is provided at Paragraph 39 below.

13. The Company is a party to seven non-residential real property leases and numerous equipment leases.

14. Andronico's currently employs 469 employees. Fifty-two of the Company's employees are not represented by a union. The Company's store labor force is unionized and part of the United Food and Commercial Workers Union. The collective bargaining agreement between the union and the Company expires in October 2011.

15. Andronico's is a California C-corporation, owned by Solano Enterprises LLC, a California limited liability company.[5] The ownership of Solano Enterprises LLC is divided among various Andronico family members.

16. On October 29, 2010, the Debtor retained the services of Bailey, Elizondo & Brinkman LLC ("BEBLLC") to serve as its financial and restructuring advisor to assist the Company in the evaluation of restructuring alternatives, negotiation with the its lenders, and in canvassing the marketplace for potential investors or buyers. As discussed in more detail commencing at Paragraph 24 below and in the Andronico Declaration and the Brinkman Declaration, commencing in February 2011, BEBLLC and the Company actively explored opportunities to sell the Company and/or raise equity investment. These efforts culminated in the execution of a letter of intent with Renovo Capital, LLC ("RCL") in June 2011, the specific nature of the transaction still to be determined at that time (the "RCL LOI"). As discussed below and in the supporting declarations, additional

---

[5] Prior to the Loan Acquisition, SSI held a stock interest in the Company. Specifically, in February 2007, SSI was issued warrants to purchase up to 25% of the Class A common stock of the Company in conjunction with providing the Company with a $20 million subordinated credit facility. The warrants vested annually over seven years, and as of February 2011 approximately 57% of the warrants had vested (representing 16% of total Class A shares outstanding). On August 19, 2011, SSI surrendered all shares and warrants to the Debtor as part of the Loan Acquisition.

marketing of the acquisition opportunity has occurred following execution of the RCL LOI.

17. In connection with the Purchase Agreement and the Sale, and pursuant to that certain DEBTOR IN POSSESSION CREDIT AGREEMENT (the "DIP Credit Agreement") and approval by the Bankruptcy Court (the "Final DIP Order"), the Debtor is authorized to use cash collateral and borrow up to $5 million (collectively, the "DIP Financing") in a DIP credit facility (the "DIP Facility") provided by Renwood to provide ongoing working capital to fund the Debtor's operations and certain Chapter 11 administrative expenses pending the sale of the Purchased Assets to the highest bidder pursuant to the Sale Motion.

18. Pursuant to the DIP Credit Agreement, the Debtor is required to meet certain milestones to avoid a default. Among these milestones is that the Court enter orders granting the Sale Motion and related Assumption Motion on or before October 13, 2011. Finally, the Sale must close on or before October 21, 2011.

19. The Debtor believes that an expedited sale process is necessary to realize the highest value for the Purchased Assets and is appropriate under the circumstances. As noted above and discussed in greater detail below, the Debtor and BEBLLC broadly marketed the opportunity for an acquisition or investment starting in February 2011. The Debtor believes that it has identified those persons who could be interested in presenting a bid, all of whom have been provided notice of the proposed bid procedures (discussed below) among other sale related information. During the bankruptcy case, BEBLLC has marketed the acquisition opportunity to potential bidders and will continue these efforts prior to the Sale Hearing.

20. Time is also of the essence due to the seasonal nature of the business. It is imperative to Renwood, and is anticipated to be critical to other bidders, that the Sale close in October so that appropriate marketing and other measures may be taken by Renwood or the Successful Purchaser to prepare for the busiest time of the business, November and December.

21. The Court has established certain procedures (the "Bid Procedures") with respect to the submission of overbids as set forth in its AMENDED ORDER APPROVING OVERBID PROCEDURES AND RELATED MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTOR (the "Bid Procedures Order") a copy of which is attached to the Kaelin Declaration as Exhibit "A." If there are Qualified

Bidders (as defined in the Bid Procedures Order), an auction (the "<u>Auction</u>") will be held at the Sale Hearing. A copy of the Bid Procedures approved by the Court is attached to the Kaelin Declaration as Exhibit "B."

22.     While the proposed Sale is not anticipated to provide funds for distribution to creditors, the Debtor believes the proposed sale is in the best long-term interest of the Debtor's customers, vendors and employees. It is anticipated that the majority of the Debtor's employees will be offered employment by Renwood or the Successful Purchaser. The assumption and assignment of many of the Debtor's unexpired leases and executory contracts will reduce overall claims against the Debtor. As discussed below, Renwood has also agreed to assume certain liabilities of the Debtor.

## IV.    **PROPOSED SALE TO RENWOOD**

**A.    Summary of Proposed Sale.**

23.     The following is a general description of the key points contained in the Purchase Agreement by and between Renwood and the Debtor. This description is offered for the convenience of the parties, potential overbidders and the Court. It is recommended that all parties review the Purchase Agreement to gain a full and complete understanding of its contents.[6]

- The Purchase Agreement provides for Renwood to acquire all of the assets of the Debtor, with the exception only of those assets specifically excluded from the Sale.

- Assets excluded from the Sale include, among other things, certain cash, the Debtor's rights under certain contracts and leases, certain avoidance claims and causes of action, assets held in trust for the benefit of employees, certain insurance policies relating to the business (other than as provided at Section 5.4 of the Purchase Agreement), and other assets as specified in the Purchase Agreement.

- Pursuant to the Purchase Agreement, Renwood will pay approximately sixteen million dollars ($16,000,000) in a combination of cash and a credit bid against the Debtor's obligations to Renwood under the DIP Facility and/or the Prepetition Debt (Renwood will have the sole discretion to determine whether its credit bid is on account of Prepetition Debt or amounts owed under the DIP Facility), which includes (x) the cure amounts required pursuant to the executory contracts and unexpired leases to be assumed and assigned pursuant to the Sale, and (y) assumption

---

[6] In the event of any inconsistency between the description provided herein and the Purchase Agreement, the Purchase Agreement shall control. This description is offered as an aid to permit interested parties and potential overbidders a convenient place to review the key terms contained in the Purchase Agreement.

The Bid Procedures permit bids of less than all of the assets, as well as combined bids by Qualified Bidders. Accordingly, any bidders who bid on less than all of the assets may propose terms that differ from the Purchase Agreement with Renwood.

of certain liabilities, including the funding of certain administrative expenses as specified in the Purchase Agreement (collectively, the "Purchase Price").[7]

- In addition, Renwood or the Successful Purchaser will assume certain liabilities as provided by the Purchase Agreement. These include, *inter alia*, (a) all liability for valid unpaid claims under the Perishable Agricultural Commodities Act ("PACA") from the operation of the business (the "PACA Claims"); (b) all post-petition liabilities arising from the operation of the business from and after the Petition Date to the extent not previously paid, including any valid unpaid 503(b)(9) claims (the "503(b)(9) Claims");[8] (c) all liability under outstanding gift certificates; and (d) liabilities and obligations arising under Assumed Contracts from and after the closing of the Sale.[9]

- Renwood intends to extend offers of employment to the majority of current employees of the Company, including the Debtor's Chief Executive Officer, William Andronico.

- The Successful Purchaser shall be responsible for all sales, use, transfer, stamp or similar Taxes directly arising out of the transfer of the Purchased Assets. The Debtor is responsible for any federal or California income taxes arising from the sale of the Purchased Assts to Purchaser as well as any California sales taxes due for the period prior to the Closing; provided that the Debtor may use the Tax Reserve under the Purchase Agreement (valued at approximately $78,500) to pay any such taxes (The Debtor currently estimates it potential income tax liability at zero to $50,000 based on a $16 million purchase price). The Successful Purchaser shall be responsible for all Property Taxes for the tax period that includes but does not end on the Closing Date. The Debtor has forecasted post-petition tax obligations, including sales taxes which are paid in arrears, and those estimated amounts are included in the DIP Budget. Based on the foregoing, the Debtor believes that all post-petition tax liabilities will be satisfied.

- It is anticipated that many of the Debtor's executory contracts and unexpired leases will be assumed by the Debtor and assigned to Renwood or the Successful Purchaser, i.e. the Assumed Contracts. With respect to any executory contracts that are assigned to Renwood or the Successful Purchaser, Renwood or the Successful Purchaser (as applicable) shall be responsible for any cure amount due to the non-debtor contracting party. The Purchase Agreement estimates total cure amounts at approximately $277,445.00; however, the actual cure amounts might vary significantly based on the actual executory contracts and unexpired leases assumed by Renwood or the Successful Purchaser and the cure amounts for such contracts and leases established by the Court.

- All licenses, permits and governmental authorizations required for the business will be assigned to Renwood or the Successful Purchaser to the fullest extent permitted by law, including the liquor licenses held by the Debtor.

- Renwood or the Successful Purchaser may designate those avoidance actions

---

[7] Earlier filings with the Court provided for an estimated $20 million purchase price. The purchase price of approximately $16 million is the result of final negotiation of the terms of the Purchase Agreement.

[8] Separate orders have been entered in the Bankruptcy Case with respect to procedures for the 503(b)(9) Claims and PACA Claims. Allowed 503(b)(9) Claims and PACA Claims will be paid during the bankruptcy case pursuant to these procedures and the approved DIP Financing. Any valid claims remaining unpaid as of the date of the Closing of the Sale will be assumed by Renwood.

[9] Renwood does not intend to assume the Debtor's Collective Bargaining Agreement ("CBA"). The CBA expires in October 2011. It is anticipated that Renwood will negotiate a new agreement with the union(s). Because Renwood is not taking assignment of the CBA, any outstanding employee obligations remaining at the Closing will remain with the Debtor.

that do not remain with the Bankruptcy Estate. The Purchase Agreement provides Renwood with a 60 day period following the Closing Date to supplement such list. Based on the definition of "avoidance actions" under the Purchase Agreement, any such action that might exist against Renwood or any of its affiliates, or any of the employees hired by Renwood (including insiders) are Purchased Assets (meaning to the extent any such claims exist, they will not remain with the Debtor).

- In the event that Renwood is the Successful Purchaser and it has not otherwise credit bid all amounts currently due and owing to it, Renwood will be deemed to have waived any and all claims it may have against the Debtor's estate, and in consideration for such waiver, the Debtor will be deemed to have waived any and all claims it might have against Renwood or any of its affiliates.

- The Purchase Agreement includes representations, warranties and covenants of the Debtor and Renwood that are customary for transactions of this type. With limited exceptions, the representations, warranties and covenants do not survive the Closing.

- Section 12 of the Purchase Agreement sets forth the bases for termination of the Purchase Agreement. Among other rights of Debtor and Renwood, Renwood may terminate the Purchase Agreement if the Court does not enter the Sale Order and the Assumption Order by October 13, 2011.

- The Sale is expressly subject to Court approval and certain bid procedures (including an opportunity to overbid) as described in the Bid Procedures and the Bid Procedures Order. Various deadlines and procedures to qualify as a "Qualified Bidder" are set forth in the Bid Procedures and the Bid Procedures Order. Interested bidders are cautioned to pay careful attention to all dates and procedures.

- In the event that the Purchased Assets are sold to a bidder other than Renwood, the Purchase Agreement obligates the Debtor to pay Renwood a breakup fee of $250,000 as discussed below.

- The closing (the "Closing") shall occur on or within three (3) business days of the satisfaction (or waiver) of the conditions set forth in Article 10 of the Purchase Agreement; provided, however, that the Sale is required to close on or before October 21, 2011.

**B.    Additional Information.**

The following information is provided to assist creditors and other parties in interest in evaluating the proposed Sale.

Alternatives to Sale and Auction; Marketing of Purchased Assets; Compensation Arrangement with BEBLLC

24.    As indicated above, BEBLLC was retained by the Company on October 29, 2010 to serve as its financial and restructuring advisor to assist the Company in the evaluation of restructuring alternatives, negotiation with its lenders, and in canvassing the marketplace for potential investors or buyers. BEBLLC prepared a confidential information memorandum detailing the Company, its history, and the investment or acquisition opportunity. BEBLLC utilized its

proprietary database consisting of over 3,000 investors, providers of capital, and advisors to capital

advisors, and beginning in February 2011 through June 2011, BEBLLC and Company management

specifically identified and contacted 46 prospective candidates, received executed non-disclosure

agreements from 25 of them, and letters of intent from 3.  Of the 46 prospective candidates, 9 of

them were strategic buyers, which are investors or buyers that are currently in the grocery business

and possess specific industry know-how and knowledge.  The remaining 37 prospective candidates

were financial buyers, which are financial sponsors or private equity investment groups, located

throughout the United States and which generally fall into one or more of the following categories:

(a) retail, food & beverage or consumer oriented investors; (b) middle-market investors generally

focused on investments requiring $10 million - $50 million of new, invested capital; and (c)

distressed or special situations investors that specialize in acquiring or investing in troubled or

financially challenged companies.  In addition to the aforementioned 46 prospective candidates who

ultimately were targeted and contacted, BEBLLC contacted 25-30 potential investors who indicated

that this investment opportunity was not desirable.  The list of potential investors, which began with

over 3,000 candidates, was strategically pared down based upon feedback from the initial contacts

and from industry input from the Company's management and board of directors.  As a result of this

comprehensive process, the Debtor believes that there has been extensive marketing of the

Company's assets.

25. The Company and BEBLLC solicited the assistance of Unified Grocers, Inc. ("UG"),

the largest wholesale grocery cooperative in the Western United States, to identify and contact

potential strategic buyers.  UG, which has provided store sale assistance to its members for many

years, identified 5 strategic candidates, all of whom were included in the 46 prospective candidates

who were contacted and who UG believed had the financial wherewithal and expansion interest to

be able to purchase one or more of the Company's stores as going concern entities.  Further, the

Company's board of directors, which includes two outside directors who are former supermarket

executives and one director who also sits on the board of a large, public supermarket, was

instrumental in identifying and vetting potential investors.

26. As part of the due diligence process, BEBLLC established an online data room which

provided prospective buyers with access to substantial diligence materials. This online data room continues to exist today. After marketing the opportunity for approximately five months, in June 2011, Andronico's entered into the RCL LOI. The RCL LOI included a sixty day exclusivity period during which time Andronico's agreed to work exclusively with RCL. Exclusivity was subsequently terminated on or about July 28, 2011 (and therefore was in effect for only about 35 days). Once exclusivity was terminated and during the subsequent 5 days, BEBLLC contacted the two other parties, the back-up bidders, who both previously submitted a LOI. RCL and the Company's two secured lenders, BOW and SSI, on or about August 2, 2011 informed BEBLLC that they had reached an agreement whereby the secured lenders would sell the Company's secured debt to RCL.

27.     Exclusivity was subsequently terminated on or about July 28, 2011 (and therefore was in effect for only about 35 days). Once exclusivity was terminated and during the subsequent 7 days, BEBLLC contacted the two other parties, the back-up bidders, who both previously submitted an LOI, and BEBLLC re-initiated sale discussions and negotiations with those parties. Before an agreement could be reached with either of these parties, RCL and Company's two secured lenders, BOW and SSI, on or about August 2, 2011 informed BEBLLC that they had reached an agreement whereby the secured lenders would sell the Company's secured debt to Renwood, an affiliate of RCL. Conversations and deal discussions continued with the back-up bidders until Renwood completed the acquisition of the BOW and SSI debt was completed on August 19, 2011.

28.     During the period from November 2010 through March 2011, the Company and BEBLLC explored numerous alternatives to the sale of the Company. Those alternatives included numerous scenarios involving a comprehensive restructuring and recapitalization of the Company's balance sheet. These actions generally contemplated an investment of some new capital, from existing equity holders, new investors, or both, and the pay-down and restructuring of the secured debt obligations owed to BOW and JPM. In addition, the Company and BEBLLC analyzed and evaluated a new-value plan scenario whereby the existing shareholders would contribute new equity and the subordinated lender, SSI, would possibly convert, restructure or forgive some portion of secured debt in exchange for equity interests. After extensive evaluation and discussion, such alternatives were deemed to be infeasible. The only viable solution, whereby Andronico's would

operate as a going concern and continue to employee approximately 469 employees, was to sell the Company, in whole or in parts. In early March 2011, the Company's board of directors authorized BEBLLC to formally begin the sale process. Further, it was determined that a sale of the Company, whose enterprise value appeared to be substantially less than the total amount of secured debt, was in the best interest of creditors and would result in the highest and best recovery for creditors.

29. Pursuant to the RCL LOI, Renwood has been reimbursed for $100,000 of its pre-petition out of pocket expenses pertaining to due diligence, evaluation of the form of the transaction, among other expenses. The RCL LOI provided a $150,000 cap on such expenses prior to Renwood's agreement to proceed with an auction in bankruptcy with the opportunity for overbid. As discussed below, the Purchase Agreement includes a breakup fee of $250,000 which is payable in the event the Purchased Assets are sold to a buyer other than Renwood.

30. During the post-petition period, BEBLLC has updated and refreshed the sale marketing materials, updated the online data room, and created a proposed transaction summary, a "teaser", that was emailed during the week of September 5, 2011 to approximately 1,500 potential investors, capital sources, and advisors, who are BEBLLC contacts from its proprietary database. The 46 prospective candidates, excluding those who asked to be removed from the list, were also emailed the teaser. A supplemental "teaser" is planned based on the final terms of the Purchase Agreement and the Bid Procedures Order. BEBLLC has been actively responding to inbound inquiries from potential bidders as a result of the teaser email and general inquiries stemming from the publicity generated by the Chapter 11 filing. In addition, BEBLLC anticipates that inquiry, and potentially due diligence, will continue for the next couple of weeks.[10]

31. The Company believes there may be 5-10 interested parties with respect to the purchase of one or more stores. The Debtor intends to conduct an auction of its assets pursuant to the Bid Procedures approved by the Court. The Bid Procedures authorize bids for all or some of the assets, and for combined bids by multiple purchasers. The Debtor believes that it has identified those persons who could be interested in presenting a bid, all of whom were provided notice of the

---

[10] The Debtor will supplement the record prior to or at the hearing with respect to marketing efforts that occur from date of this Sale Motion to the Sale Hearing.

hearing on the proposed bid procedures and will be provided notice of the proposed Sale.

32.     Through BEBLLC's auspices, the Debtor believes it has proposed a fair and efficient auction process, and achieved its goal of producing the highest and best stalking horse bidder, as well as fostering significant interest among potential bidders in the ultimate Court-conducted auction at the Sale Hearing.

33.     In exchange for BEBLLC's continued services in the bankruptcy case, the Debtor has agreed to pay BEBLLC hourly subject to Court approval following a duly noticed application for compensation.

Asset Valuation

34.     The Debtor has not had a formal valuation of the Company prepared.  However, the company did engage Great American Advisory & Valuation Services, L.L.C. ("GA"), a national appraisal, valuation, and liquidation company, to appraise the Company's interest in the leaseholds of the 8 stores that Andronico's operated in April 2011.  GA considered all three typical approaches to value: the cost approach, the sales comparison approach, and the income capitalization approach, and GA concluded that the cumulative "as-is" value of 8 leaseholds was approximately $1.6 million.  However, GA pointed out several factors, including insufficient remaining lease term or insufficient differential between the in-place and market rent, that ultimately may impact the values of the leasehold interests.  As a result, GA stated that each of the 8 leasehold interests were not considered marketable and therefore has no market value.

35.     Historically, the Company has generally performed a wall-to-wall physical count of inventory at each store location at the end of each four-week accounting period, and the company engages third party inventory specialists to perform and oversee the majority of the department counts in order to ensure accuracy and completeness of the inventory valuation at the end of each period.  The last such inventory performed was for the four-week period and year-end on July 30, 2011.

36.     As of July 2, 2011, the book value of the Company's total assets was $ 24.4 million.  The book value of the Company's liabilities was $ 44.8 million based on U.S. GAAP.

/ / /

DAK
J:\Andronico's\Sale\Motion\MTX
12
MOTION BY DEBTOR TO SELL CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS

Case: 11-48963   Doc# 184   Filed: 09/20/11   Entered: 09/20/11 19:05:30   Page 18 of 38

Relationship to Renwood/Post-Sale Relationship with Renwood

37.     The Purchase Agreement is the result of arms-length, extensive negotiations between the Debtor and Renwood.  As discussed above, Renwood is a secured creditor by virtue of the Pre-Petition Debt and the DIP Financing.   The Debtor has no other connection with Renwood and no director or officer of the Debtor is an officer or director of Renwood or vice-versa.  With the Closing of the transaction with Renwood, it is contemplated that Renwood will extend offers of employment to the majority of the Company's employees, including certain insiders.

Insider Compensation

38.     For the period August 22, 2011 through October 21, 2011 (by which date the Sale is required to close), officers will continue to receive their salaries or other compensation, and directors will be compensated on a quarterly basis:

| Officer/Title/Director | Salary/Compensation |
| --- | --- |
| William Andronico, CEO | $55,488.46 |
| Louis Razzano, Director of Risk Management | $28,062.00 |
| Alan J. Reed, Director | $3,350.00/quarter |
| Peter G. Hanelt, Director | $3,350.00/quarter |
| Terry Peets, Director | $3,350.00/quarter |

Debt Structure of Debtor/Estimated Distribution of Proceeds

39.     The Debtor's bankruptcy schedules[11] are on file with the Court and may be summarized as follows.

Secured Debt.  As of the Petition Date, the Pre-Petition Debt owing to Renwood totaled approximately $29 million.  The DIP Facility is $5 million representing a secured and administrative claim obligation of the Debtor.  Pursuant to the Purchase Agreement, Renwood will credit bid approximately $14,707,690 of the amount owed by the Debtor, or up to the full amount owed to it if an auction occurs at the Sale Hearing.  If another bidder prevails at the Auction, the

---

[11] The Debtor is continuing to reconcile its books and records with its bankruptcy schedules and therefore may amend its bankruptcy schedules as appropriate.

outstanding balance owing on the Pre-Petition Debt and the DIP Credit Agreement will be due and owing to Renwood. The Debtor's Bankruptcy Schedule D lists other secured creditors which are believed to be protective filings for lease agreements (and as such are not true secured obligations) or the underlying obligations are no longer owing and as such, the filings are disputed. These scheduled creditors and additional asserted secured claims are discussed commencing at Paragraph 65 below.

Administrative Claims. Other than the outstanding fees and expenses owing to the professionals employed by the Debtor and the Committee, the Debtor anticipates that all other administrative expenses will have been paid as of the Closing. To the extent that any administrative business expenses (other than professional fees) remain owing as of the Closing, the majority will be paid by Renwood (excluding obligations to employees including obligations under the CBA). Section 503(b)(9) Claims are discussed at Paragraph 40 below. The Debtor has included estimates in the DIP Financing budget for Court-approved professionals in connection with the DIP Financing Order. Pursuant to the DIP Financing Order, upon approval by the Bankruptcy Court, professional fees will be paid from existing retainers where available and the Carve-Out Account. If the fees and expenses of the professionals employed by the Debtor and the Committee are in excess of retainers and the amount in the Carve-Out Account, the estate may be administratively insolvent. Any excess amounts in the Carve-Out Account or held by retainers by the professionals will be returned to Renwood as provided by the DIP Financing Order.

Priority and General Unsecured Claims. Unpaid priority claims of employees and governmental agencies as of the date of this Motion are estimated at approximately $563,000, taking into account payments made post-petition as authorized by the Court (see Paragraph 40 below). The non priority portion of employee and governmental claims are estimated at approximately $274,000. Together with the creditors listed on Bankruptcy Schedule F, general unsecured claims are estimated at approximately $9,450,000. The bar dates for the filing of general unsecured claims, governmental claims and rejection claims (to be established by the Court) have not yet expired. In the case of rejection claims (for executory contracts and leases not yet rejected), a bar date will not be requested until the Debtor determines which executory contracts and unexpired leases remain after the Closing

and the Debtor makes a motion to reject such executory contracts and unexpired leases. The actual allowed claims may also vary significantly from the amounts listed above based on the filing of claims against the Company not scheduled by the Company.

40. Pursuant to an order entered in the bankruptcy case, the priority portion of employee claims relating to unpaid wages may be paid by the Debtor from the DIP Facility and employees' requests for accrued vacation, sick or other days will be honored in the ordinary course of business. As indicated above, PACA Claims (estimated by the Debtor at approximately $581,070 as of the Petition Date) and Section 503(b)(9) Claims (estimated at approximately $1,905,532 as of the Petition Date) will be paid pursuant to the procedures established by orders of the Bankruptcy Court. Payment of these allowed claims will occur from the DIP Facility, and to the extent still outstanding as of the Closing, by Renwood. Those persons who are a party to an executory contract or unexpired lease with the Debtor which is assumed and assigned to Renwood or the Successful Purchaser, will be paid by Renwood or the Successful Purchaser the amount required to cure any outstanding amounts due (estimated at $277,445), and Renwood or the Successful Purchaser will satisfy the obligations under such executory contract or unexpired lease from and after the Closing of the Sale. The Debtor does not contemplate funds will be available from the Sale to satisfy any other claims of creditors.

41. Pursuant to this Sale Motion, if Renwood is not the successful purchaser, the Debtor requests authority to pay from the proceeds of the Sale the following: (a) the Breakup Fee (defined below) owing to Renwood;[12] and (b) Renwood's allowed secured claim, subject to the terms and conditions of the Final DIP Order. As noted above, as of the Petition Date, the Debtor owed approximately $29 million (excluding accrued interest) to Renwood on the Pre-Petition Debt, and up to $5 million pursuant to the DIP Credit Agreement.

///

///

---

[12] The Debtor's obligation to pay the Breakup Fee is set forth at Section 7.6(a) of the Purchase Agreement and is discussed at Paragraph 61 below. The Bid Procedures Order authorizes payment of the Breakup Fee in the amount of $250,000.

**Communications with Creditors and Shareholders**

42.     As discussed above, the Company began actively pursuing restructuring and recapitalization options with its secured lenders in November 2010.   In March 2011, the Company formally requested that BEBLLC assist and advise it with a sale process.

43.     During the period from November 2010 through filing of Chapter 11 on August 22, 2011, the Company and its advisors communicated with, and provided financial information to, its secured lenders on a regular and consistent basis.  Further, in March 2011 the Company began a recurring, weekly conference call update with SSI (BOW declined the same opportunity) to discuss operating results, financial performance, and status of the sale activities.  The Company prepared several restructuring and recapitalization plans and presentations that were provided to the secured lenders, and some of which were also provided to UG, the Company's wholesale partner, in attempt to garner economic support, including capital contribution.  Many of the communications and presentations provided to the secured lenders and UG contained detailed, confidential operating information.  Finally, the Company's employees communicated extensively, generally on a daily basis, with its vendors, or unsecured creditors, during the pre-petition reorganization process.  While the possibility of the filing of the bankruptcy case was not specifically discussed, product and service vendors were informed about the status of invoices, terms of payment, and the Company's recapitalization efforts.  In addition, the Company did specifically discuss its financial situation and the possibility of bankruptcy with some of its landlords.

44.     Bill Andronico, the Company's CEO, represented the majority shareholders (the various Andronico family interests) in discussions with the Company and its lenders.  SSI, a secured lender, was also a minority shareholder via the exercise of warrants.

45.     On August 22, 2011, the Company issued a press release announcing that it had filed a voluntary petition under chapter 11 of the United States Bankruptcy Code and that the Company intended to proceed with the sale of its assets pursuant to Section 363 of the Bankruptcy Code.

46.     The Debtor has filed numerous motions in the case apprising affected vendors and other creditors of the Company's intent to sell its assets to Renwood subject to overbid.

47.     On or before September 22, 2011, the Debtor will have caused notice of the hearing

on this Sale Motion (the "Sale Notice") to be served on all creditors and equity holders as required by the Bid Procedures Order.

## V.    ARGUMENT

**A.    The Sale Should Be Approved as Fair, Reasonable and in the Best Interest of Creditors and the Bankruptcy Estate.**

48.    Bankruptcy Code Section 363(b) and Rule 6004 of the Federal Rules of Bankruptcy Procedure ("Fed. R. Bankr. P.") authorize a debtor to sell assets of the estate other than in the ordinary course of business, after notice and a hearing.  See, e.g., Otto Preminger Films, Ltd. v. Qintex Entertainment, Inc.(In re Qintex Entertainment, Inc.), 950 F.2d 1492, 1495 (9th Cir. 1991).  In accordance with Fed. R. Bankr. P. 6004(f)(1), sales of property outside of the ordinary course of business may be by private sale or public auction.  See Fed. R. Bankr. P. 6004(f)(1).  One of the most obvious business justifications in any sale of estate assets is the ultimate purpose of obtaining the highest price for the property sold.  In re Wilde Horse Enterprises, Inc., 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991).  "In approving any sale outside the ordinary course of business, the court must not only articulate a sufficient business reason for the sale, it must further find it is in the best interest of the estate, i.e., it is fair and reasonable, that it has been given adequate marketing, that it has been negotiated and proposed in good faith, that the purchaser is proceeding in good faith, and that it is an 'arms-length' transaction."  Id.  Here, the Debtor believes that its ability to select the highest and best bidder at a Court-supervised auction enhances and benefits the marketing process by providing a motivation for bidders to submit a qualified bid with a high market value.

49.    Although Section 363(b) does not provide an express standard for determining whether a court should approve a particular proposed sale, courts have examined (i) whether the proposed transaction has a valid business justification or good business reason, (ii) whether the sale is the result of good faith negotiations, and (iii) whether the proposed purchase price is fair and reasonable.  See, e.g., In re Abbotts Dairies, 788 F.2d 143, 149-50 (3rd Cir. 1986); 240 North Brand Partners, Ltd. v. Colony GFP Partners, L.P. (In re 240 North Brand Partners, Ltd.), 200 B.R. 653, 659 (9th Cir. B.A.P. 1996); 3 Collier on Bankruptcy ¶ 363.02[4] (16th ed. rev. 2011) ("[C]ourts generally apply standards that, although stated various ways, represent essentially a business

Case 1:48063  Doc#:184    Filed: 09/20/11    Entered: 09/20/11 19:05:30    Page 23 of 38

DAK\Ambrose\Sale\Sale Motion.DOCX    17    MOTION BY DEBTOR TO SELL CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS

judgment test.").  All three of these factors are satisfied here.

        **i)**      **There Is a Valid Business Justification and Good Business Reason to Support the Sale.**

50.     The Ninth Circuit Bankruptcy Appellate Panel in <u>Walter v. Sunwest Bank (In re Walter)</u>, 83 B.R. 14, 15-16 (9th Cir. B.A.P. 1988) applied a flexible, case-by-case test to determine whether a sound business purpose justifies a proposed sale under Section 363(b).  Adopting the reasoning of the Fifth Circuit in <u>Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.)</u>, 780 F.2d 1223, 1226 (5th Cir. 1986) and the Second Circuit in <u>In re Lionel Corp.</u>, 722 F.2d 1063, 1071 (2d Cir. 1983), the Panel noted that whether a proffered justification is sufficient will depend on the specifics of the case.  Therefore, the Court here should consider all salient factors pertaining to the case and act to further the diverse interests of the debtor and creditors alike.  <u>Walter v. Sunwest Bank</u>, 83 B.R. at 15-16.

51.     The facts pertaining to this Sale amply justify and substantiate the Debtor's business judgment that the proposed Sale is in the best interest of its creditors and the bankruptcy estate.  As set forth in the Andronico Declaration and the Brinkman Declaration, the Company explored a number of strategic alternatives and engaged BEBLLC to further its efforts.  Based on the extensive marketing of the opportunity over the past months, the Debtor does not believe that additional time will yield any additional bids than may be presented pursuant to the Bid Procedures.  The Company's financial situation also requires that the Sale close as soon as possible.  As already noted, the Debtor's access to DIP Financing and its use of cash collateral with Renwood's consent terminates if the Sale does not close by October 21, 2011.  The Debtor needs access to cash collateral to permit the orderly continuation of the operation of its business and to maintain business relationships with and pay employees, vendors and suppliers, to maintain appropriate inventory, and to satisfy other working capital needs.  The Sale allows the estate to realize a going concern value for the Purchased Assets without risk of future reduction in value and is anticipated to provide employment to the majority of the Debtor's employees and relieve the Debtor of liability under the Assumed Contracts following the Closing.  Moreover, the disposition of the Purchased Assets as proposed herein, with the submission of a stalking horse bid and the implementation of Court-

approved auction and bid procedures, affords additional assurance that the highest and best price will be realized for the Purchased Assets. Notice of the proposed Sale and Bid Procedures will be provided to potential bidders by September 22, 2011 (as indicated above, potential bidders have already been sent the teaser of the acquisition opportunity by BEBLLC). Notice of the Sale Hearing will be provided to all persons the Debtor and BEBLLC believe may have an interest in the Purchased Assets. The Debtor believes that notice to such parties will encourage overbids for the Purchased Assets.

52.     The courts have long recognized that where a sale is made in good faith and upon a reasonable basis – as the proposed sale is here – "[t]he court will not entertain objections to a trustee's [debtor in possession's] conduct of the estate." In re Curlew Valley Assocs., 14 B.R. 506, 513-514 (Bankr. D. Utah 1981); see also In re Southern Biotech, Inc., 37 B.R. 318, 322-23 (Bankr. M.D. Fla. 1983); In re Kabuto Ariz. Props., LLC, 2009 Bankr. LEXIS 4961 at *67 (Bankr. D. Ariz. Dec. 9, 2009) ("Indeed, when applying the 'business judgment' rule, courts show great deference to a debtor's decision-making."). This is because it is the "Trustee [debtor in possession], not the Court, [that] is selling [the] property." In re Gulf States Steel, Inc. of Ala., 285 B.R. 497, 516 (Bankr. N.D. Ala. 2002). In accordance with Walter and the foregoing cases, the Debtor submits that there is valid business justification and good business reason for the proposed Sale of the Purchased Assets on the terms contained in the Purchase Agreement and in the manner provided in the Bid Procedures Order. As such, the Debtor believes the Court should approve the Sale and allow it to move forward expeditiously.

### ii)     The Proposed Sale Is in Good Faith and Renwood or the Successful Overbidder Should Be Afforded the Protections of 11 U.S.C. § 363(m)

53.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to any entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

54.     Although the Bankruptcy Code does not define "good faith," courts have found that the good faith requirement focuses principally on the disclosure of all material sale terms and

absence of fraud or collusion between bidders. *See, e.g.*, <u>In re Abbotts Dairies</u>, 788 F.2d at 147-48; *see also*, <u>In re Apex Oil Co.</u>, 92 B.R. 847, 869-71 (Bankr. E.D. Mo. 1988). It is typically only "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" that leads to a determination that a sale proceeding lacks good faith. <u>T.C. Investors v. Joseph (In re M Capital Corp.)</u>, 290 B.R. 743, 748 n.3 (9th Cir. B.A.P. 2003) (*quoting* <u>Community Thrift & Loan v. Suchy (In re Suchy)</u>, 786 F.2d 900, 902 (9th Cir. 1985)).

55.    While the Ninth Circuit does not require a finding of good faith be made by the Court at the time of the Sale,[13] it is clear under the circumstances of this case that the Sale of the Debtor's assets to Renwood or a competing bidder as contemplated by the Purchase Agreement is proposed in good faith. As supported by the Andronico Declaration, the Debtor and Renwood have at all times acted in good faith. The Purchase Agreement was negotiated between the Debtor and Renwood at arms-length without collusion or fraud of any kind. The purchase price contemplated by the Purchase Agreement was not limited or controlled by an agreement among potential bidders at the Sale. Renwood is not an "insider" or "affiliate" of the Debtor (as such terms are defined in the Bankruptcy Code). The Bid Procedures Order specifically provides for overbids at the Sale Hearing. The proposed Sale to Renwood is nothing more than a public auction. Finally, full disclosure of the terms of the proposed Sale transaction will be afforded to creditors and potential bidders pursuant to the Sale Notice which describes the material terms of the proposed Sale, the Purchase Agreement and the Bid Procedures.

56.    Prospective bidders will be required to provide evidence in support of a finding of good faith with a showing to include those matters set forth at item 5 of the Court's promulgated GUIDELINES RE SALE ORDERS. The Bid Procedures also set forth the evidence required by Qualified Bidders for a good faith finding.

57.    Based on the foregoing, Renwood, and the Successful Purchaser, if a similar showing has been made, should be deemed a good faith purchaser within the meaning of Section 363(m).

/ / /

---

[13] *See* <u>Thomas v. Namba (In re Thomas)</u>, 287 B.R. 782, 785 (9th Cir. B.A.P. 2002) ("[T]he Ninth Circuit does not require that a finding of 'good faith' be made at the time of sale." (internal citations omitted).

### iii) The Purchase Price Is Fair and Reasonable.

58. An auction sale is generally considered to be "[s]ufficient to establish that one has paid 'value' for the assets of a bankruptcy." *See* In re Abbotts Dairies, 788 F.2d at 149. In other words, the mere fact that other parties can come forward to bid at an auction that has been noticed can satisfy the fair and reasonable price requirement of a Section 363 sale.

59. The Debtor believes that the Sale will result in the highest purchase price for the assets being sold. The Company's assets have been widely marketed including through the services of a financial and restructuring advisor both prior to the Petition Date and during the bankruptcy cases [see Andronico Declaration and Brinkman Declaration]. The Debtor has provided notice of the Sale to all known potential bidders, thereby maximizing the possibility that competing bidders will come forward to pay a higher cash price for the Purchased Assets than offered by Renwood in the Purchase Agreement. In essence, Renwood has set the floor for the bidding at the Auction. As reasoned by the Ninth Circuit in Arnold & Baker Farms, the precise value of the Purchased Assets being sold in this instance will only be recognized at – and as a result of – the Sale of the Purchased Assets. Arnold & Baker Farms v. United States., 85 F.3d 1415, 1421 (9th Cir. 1996) ("Because each parcel of real property is unique, the precise value of land is difficult, if not impossible, to determine until it is actually sold.").

60. Finally, courts have recognized that a debtor is entitled to "'great judicial deference' in deciding which bid to accept as the best and highest bid." Gulf States Steel, 285 B.R. at 516 (citation omitted). Here, too, the Debtor is entitled to deference in determining not only the manner in which the assets are to be sold, but how the value of those assets is to be maximized. Based on the history and circumstances of this case, the Debtor believes that Renwood's offer (subject to overbid at the Sale Hearing) satisfies the requirement that the price paid for the Purchased Assets be fair and reasonable.

**B. The Bid Procedures Established by the Court Will Encourage Meaningful Overbids on the Purchased Assets.**

61. **Overbid Procedures.** As an inducement to Renwood to agree to enter into the Purchase Agreement on the terms set forth therein and subject to third party diligence and bidding,

and in order that the Sale process will not be delayed by last minute offers, the Debtor previously requested that the Court establish certain bid procedures concerning bids by other prospective buyers, resulting in entry of the Bid Procedures Order.[14]  The Bid Procedures will apply to any person wishing to present a competing bid with respect to all or some of the Purchased Assets.[15]

62.  **Breakup Fee.**  If the Purchased Assets are sold to a purchaser other than Renwood, the Purchase Agreement obligates the Debtor to pay to Renwood at the closing a fee in the amount of $250,000 (the "Breakup Fee").

63.  In the event Renwood is entitled to the Breakup Fee, such obligation will have priority as an administrative expense under Sections 503(b) and 507(a)(2) of the Code and will be payable solely from and secured by a first priority lien on sale proceeds and any Sale Deposit under Section 364(d) of the Bankruptcy Code.

**C.  The Sale Satisfies the Requirements of Bankruptcy Code Section 363(f) for the Sale of the Estate's Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests.**

64.  Pursuant to Bankruptcy Code Section 363(f), the Purchased Assets will be sold free and clear of all liens, claims, encumbrances and other interests other than the Permitted Liens as expressly set forth in the Purchase Agreement, including, without limitation, any claims relating or arising out of any collective bargaining agreement, health or welfare benefit plan or pension plan (including, without limitation, any "multiemployer plan," as defined in Section 3(37) or 4001(a)(3) of the Employee Retirement Income Security Act of 1974, as amended).[16]  Any such liens, claims, encumbrances and interests not satisfied prior to or currently with the Closing shall attach to the portion of the Debtor's proceeds from the Sale allocable to the property which was subject to the lien, claim, encumbrance or interest in the same priority, validity and extent as such lien, claim or interest has at the time of the Closing.

---

[14] A copy of the Bid Procedures Order is attached to the Kaelin Declaration as Exhibit "A."

[15] A copy of the Bid Procedures is attached to the Kaelin Declaration as Exhibit "B."

[16] Pursuant to the Purchase Agreement, "Permitted Liens" include only "(i) Assumed Liabilities, (ii) Liens relating to any equipment financing agreement that is not determined to be a true lease, (iii) Liens in favor of Premium Assignment Corporation as more fully set forth in any Order authorizing Seller to enter into an insurance premium financing agreement with such entity, and (iv) Liens for Taxes, assessments and similar charged that are not yet due or are being contested in good faith."

DAK
\\Anthem\Bid\Sale\Motion.DOCX
22
MOTION BY DEBTOR TO SELL CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS

Case 1:48963  Doc#:184  Filed: 09/20/11  Entered: 09/20/11 19:05:30  Page 28 of 38

65.     Pursuant to a recent search of the public records of the California Secretary of State office[17], the following is a summary of all filings against Andronico's:

| NAME | FILING NUMBER | DATE OF FILING | COLLATERAL COVERAGE |
|---|---|---|---|
| Dell Financial Services | 0113460440 | May 8, 2001 | Specific Equipment |
| The CIT Group | 0207060318 | March 8, 2002 | Specific Equipment |
| The CIT Group | 0215060564 | May 30, 2002 | Specific Equipment |
| American Bank Note Company | 0325260082 | September 5, 2003 | Consigned Goods |
| Pawnee Leasing Corporation | 067091634208 | November 13, 2006 | Specific Equipment |
| First Federal Leasing | 067092983488 | November 20, 2006 | Specific Equipment |
| Bank of the West | 077103126128 | February 14, 2007 | All of Debtor's Assets |
| Special Situations Investments, Inc. | 077103238051 | February 15, 2007 | All of Debtor's Assets |
| Special Situations Investments, Inc. | 077104044532 | February 23, 2004 | All of Debtor's Assets |
| US Bancorp | 077115057031 | May 24, 2007 | Specific Equipment |
| US Bancorp | 087152399660 | April 1, 2008 | Specific Equipment |
| US Bancorp | 087160647140 | June 6, 2006 | Specific Equipment |
| US Bancorp | 097184804819 | January 15, 2009 | Specific Equipment |
| Dell Financial Services, LLC | 097185398424 | January 22, 2009 | Specific Equipment |

[17] Searches with the California Secretary of State are current through August 24, 2011.

| NAME | FILING NUMBER | DATE OF FILING | COLLATERAL COVERAGE |
|---|---|---|---|
| US Bancorp | 107232064055 | May 17, 2010 | Specific Equipment |

66.     The filings by BOW and SSI represent the Pre-Petition Debts acquired by Renwood. Pursuant to assignments of the underlying UCC-1s, Renwood is now the holder of these liens.  To the extent Renwood is not the Successful Purchaser, Renwood's liens will attach to the proceeds of the Sale with the same priority, validity, force and effect as exists as of the Closing.  In such event, it is anticipated that Renwood will consent to the sale of the Purchased Assets to the Successful Purchaser free and clear of Renwood's liens pursuant to Section 363(f)(2).

67.     Dell Financial Services L.P. and Dell Financial Services LLC (together, "Dell") filed UCC-1s based on one or more leases (the "Dell Lease Agreement") for equipment at the Company's corporate offices previously located in Albany, California which is no longer operating and subsequently transferred to the San Francisco location.  The Dell Lease Agreement appears to constitute a conditional sales contract.  The equipment subject to the Dell Lease Agreement is included in the Purchased Assets of the Sale.  To the extent the Dell Lease Agreement does in fact constitute a conditional sales contract, the Debtor will not sell free and clear of its lien and Renwood will take subject to such lien.  To the extent the Dell Lease Agreement is a true lease for equipment, it may be assumed and assigned to the Successful Purchaser.  It is contemplated that Dell will support the assignment to Renwood or other Successful Purchaser in such instance.

68.     The CIT Group/Equipment Financing, Inc. ("CIT Group") filed UCC-1s based on true leases for certain equipment and fixtures at the Company's store previously located in Walnut Creek, California, which is no longer operating.  The Debtor satisfied its obligations under the underlying leases and exercised its option to purchase the subject equipment and fixtures, and the leases expired on their own terms.  If CIT Group's liens are not terminated by the Sale Hearing, the Debtor believes CIT Group will consent to the Sale.  In the absence of such consent, the Debtor may sell free and clear of CIT Group's liens pursuant to Section 363(f)(4) (interest in bona fide dispute).

69.     The filing by American Bank Note Company ("ABNC") pertains to a purchase agreement with respect to one or more lots of United States Postal Service stamps that the Company

offers to customers for purchase at its stores. The Debtor does not have a copy of the agreement with ABNC to determine the legal nature of the relationship and the validity of any lien asserted by ABNC. The underlying agreement with ABNC may be subject to assumption and assignment to the Successful Purchaser.

70.     First Federal Leasing filed a protective UCC-1 based on a true lease of specific equipment to the Debtor. The Debtor satisfied its obligations under the underlying lease which expired on its own terms, and the Debtor believes that it either returned the subject equipment or exercised its option to purchase such equipment. Consequently, the Debtor does not believe that First Federal Leasing possesses a valid lien on any of the Debtor's assets. If the lien is not terminated by the Sale Hearing, the Debtor believes First Federal Leasing will consent to the Sale. In the absence of such consent, the Debtor may sell free and clear of First Federal Leasing's lien pursuant to Section 363(f)(4) (interest in bona fide dispute).

71.     Pawnee Leasing Corporation ("Pawnee") filed a protective UCC-1 based on the Debtor's true lease agreement for equipment with First Pacific Funding, Inc., which was assigned to Pawnee. The Debtor believes that it either returned the subject equipment or exercised its option to purchase such equipment. Consequently, the Debtor does not believe that Pawnee possesses a valid lien on any of the Debtor's assets. If the lien is not terminated by the Sale Hearing, the Debtor believes Pawnee will consent to the Sale. In the absence of such consent, the Debtor may sell free and clear of Pawnee's lien pursuant to Section 363(f)(4) (interest in bona fide dispute).

72.     The remaining filings by U.S. Bancorp are protective filings for true leases. It is contemplated that to the extent any of its leases is included as an Assumed Contract, U.S. Bancorp will support and consent to assignment to Renwood or the Successful Purchaser (allowing the Sale to occur pursuant to Section 363(f)(2)). To the extent any equipment lease is a disguised conditional sales contract, Renwood or the Successful Purchaser will acquire the equipment subject to US Bancorp's lien on such equipment.

73.     In addition to the foregoing, subject to Court authorization and approval, the Debtor has entered into an insurance premium financing agreement (the "Insurance Premium Agreement")

with Premium Assignment Corporation II ("PAC")[18]. Pursuant to the Insurance Premium Agreement, the Debtor will grant PAC a first priority lien on, and a security interest in, unearned premiums with respect to the insurance policies as described therein. The Insurance Premium Agreement has not been designated for assumption by Renwood. Any refund of unearned premiums will be returned to Renwood to the extent funded by Renwood pursuant to the DIP Financing. The Insurance Premium Agreement is not a Purchased Asset and therefore the Debtor does not seek to sell free and clear of PAC's lien, claim or interest.

74. UG asserts a perfected security interest in shares of stock held by the Debtor as a member-patron of UG. In support of its assertion, UG has provided an APPLICATION AND AGREEMENT FOR SERVICE AFFILIATION AS A MEMBER PATRON/AFFILIATE WITH UNIFIED WESTERN GROCERS, INC. AND PLEDGE AND SECURITY INTEREST (the "Membership Agreement"). The Membership Agreement requires the member to purchase 350 Class A shares at a book value established at the end of an applicable fiscal year. A member also is required to hold Class B shares having an issuance value equal to approximately twice the amount of certain of the member's average weekly purchases. The Membership Agreement provides that the Class A and Class B shares held by the Member are governed by Division 8 of the California Commercial Code and are subject to restrictions on transfer and subject to redemption or repurchase by UG on termination of membership and other events as set forth in the Articles of Incorporation or Bylaws. The Membership Agreement also provides that all Class A Shares and Class B Shares are pledged to and the certificates shall be held by, UG to secure the prohibition against their transfer, to secure UG's right of redemption or repurchase and as security for the payment of any and all obligations (the "Obligations") of the member to UG. UG contends that it is properly perfected under Cal. Comm. Code §§ 8106 and 9106. UG further contends that it has offset and recoupment rights that represent secured claims in the bankruptcy case. The Debtor is currently investigating UG's contentions. If

---

[18] The Debtor has filed a motion requesting authorization and approval to enter into the Insurance Premium Agreement which is set for hearing on the Court's September 22, 2011 calendar. As set forth therein, the aggregate cost for the premiums under the Insurance Premium Agreement is $514,000, payable in nine (9) monthly payments of approximately $44,000, with an annual percentage rate of 4.67% and a down payment of $125,000 which will be paid from the DIP Financing.

in fact UG's security interest is not perfected, the Debtor intends to sell free and clear of UG's interest pursuant to Section 363(f)(4) (interest in bona fide dispute). To the extent it is determined that UG possesses a perfected security interest, Renwood may elect to take the Purchased Assets subject to such interest or may exclude it.

75. In addition to the above persons asserting a lien, claim or interest, the Debtor requests by this Sale Motion that the Court approve the Sale free and clear of all persons scheduled by the Debtor or who have filed a Proof of Claim or Request for Notice in this case. Since the claims bar date has not yet run, the Debtor does not know who may assert a lien, claim or interest with respect to the Purchased Assets. The Debtor will cause notice to be provided to all persons who were scheduled by the Debtor or who have filed a Proof of Claim, among others. The Sale will specify that such relief will be requested. To the extent any person not listed here asserts that it has a lien, claim or interest in or to the Purchased Assets, such lien, claim or interest is in bona fide dispute and the Sale may occur pursuant to Section 363(f)(4).

**D. The Proposed Sale Satisfies the Requirements of Bankruptcy Code Section 363(b)(1) Regarding the Sale of Personally Identifiable Information.**

76. Section 363(b)(1) restricts the transfer of personally identifiable information[19] in certain circumstances. Section 363(b)(1) provides in part:

> The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate, except that if the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless — (A) such sale or such lease is consistent with such policy…"

77. The Purchased Assets under the Purchase Agreement include all assets other than those specifically excluded. Over the years, customers have voluntarily provided an email address for purposes of receiving electronic flyers or promotional offers from the Company. The Company

---

[19] Personally identifiable information is defined at section 101(41A) of the Bankruptcy Code and includes a customer's name, address (physical and electronic), telephone numbers, credit card account numbers, date and place of birth information, and other information which may be used to identify an individual.

DAK\Antromet\Sale\Sale Motion DAK
27
MOTION BY DEBTOR TO SELL CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS

Case 1:48963 Doc#:184 Filed: 09/20/11 Entered: 09/20/11 19:05:39 Page 33 of 38

estimates that 75% of the emails were provided by customers at the register without reference to the Company's privacy policy.  The Company currently collects email addresses via a similar in store sign up campaign with Zipongo (a healthy meal coupon start-up), where a box is checked for customers wishing to receive email blasts from Andronico's in addition to being part of the Zipongo program.  These forms do not reference the Company's privacy policy.  Customers may also provide their email address via the Company's website for purposes of receiving electronic mailings authorized by the Company.  The Company's website includes a privacy policy as indicated below.  All email addresses provided by customers are used exclusively for email blasts (of weekly specials or to announce store events) by a third party as authorized by Andronico's.  Andronico's does not "sell" the lists or receive compensation for any sponsored email blasts.

78.    Andronico's website includes a privacy statement on its website (the "<u>Privacy Policy</u>").  For those customers signing up for the Company's newsletters and promotions, a link is provided to the Privacy Policy as follows:

> Andronicos.com Privacy Policy
>
> Andronicos.com offers free electronic newsletters to users. Andronicos.com gathers the e-mail addresses of users who voluntarily subscribe. Customers may remove themselves from any mailing list by following the instructions contained in every newsletter. They can also subscribe to the newsletters at the time of registration. User's shopping lists are saved as a convenience, and are not shared with anyone.
>
> Andronicos.com tracks user traffic patterns throughout Andronicos.com but this information is not correlated with data about individual users. Overall usage statistics, according to a user's domain name, browser type and MIME type acquired by reading this information from the browser string (information contained in every user's browser), are also broken down.
>
> Andronicos.com never shares newsletter mailing lists with any third parties, including advertisers or partners. We use tracking information to determine which areas of our sites users like and don't like based on traffic to those areas. Andronicos.com does not track what individual users read, but rather how well each page performs overall. This helps us continue to build a better service for you.
>
> If you have questions about this policy, please direct inquiries to the Webmaster.

79.    The Privacy Policy informs customers that they may be removed from the Company's email list by following the instructions contained in every newsletter.

80.    While the Privacy Policy does not specifically provide for the possibility of a sale of the Company, the sale to Renwood does not violate the intent of the Privacy Policy as Renwood will operate the same business as the Debtor.  The Debtor has been assured by Renwood that it will not resell or make available to third parties any of the customer information in any way inconsistent with the Debtor's Privacy Policy.  Renwood intends to use the information for the same business as the successor in interest to the Debtor, under the same Privacy Policy of the Debtor.  Thus, the Debtor does not believe that the inclusion of customer information in connection with the Sale is adverse to the interests of the Debtor's customers, and the transfer of the information will allow customers to avoid a disruption in the receipt of promotional offers and newsletters.  To the extent any customer wishes to be removed from any mailings or communications by Renwood, the customer may make this request of Renwood just as she or he could request at any time of the Company.

**E.    Name Change of Debtor**

81.    Under the Purchase Agreement, the Debtor's name is included in the definition of Purchased Assets.

82.    In contemplation of the Closing, Andronico's has reserved a new legal name, as follows:  "AMI Liquidating, Inc." The Debtor requests authority to file all documents as are necessary to reflect such name change in its state of incorporation.  Notwithstanding the foregoing, the Debtor intends that it will continue to refer to "Andronico's Markets, Inc., a.k.a. "Andronico's Community Markets" as former names for legal and noticing purposes in this bankruptcy case and in other legal documents.

83.    In conjunction with its name changes subsequent to the Closing, the Debtor further respectfully request the Court to authorize that all pleadings be filed and docketed under its new name "AMI Liquidating, Inc.," and be consistent with the proposed form of caption attached as **Exhibit "C"** to the Kaelin Declaration and incorporated herein by reference.  The Debtor submits that reference to "Andronico's Markets, Inc." will provide notice to parties for purposes of the Debtor's Chapter 11 case.

**F.    Accurate and Reasonable Notice Has Been Provided.**

84.    Pursuant to the Bid Procedures Order, the Court has authorized the manner of service

with respect to the proposed Sale.

85.     The Sale Notice sets forth a summary of the Bid Procedures and the terms of the Purchase Agreement and directs individuals to Debtor's counsel for additional information. The Assumption Notice provides the other parties to contracts with the proposed "cure" amounts, the date by which objections to the proposed assumption and assignment of their contract must be filed and the consequences of the failure to file an objection.

86.     Evidence of service of all sale-related pleadings in accordance with the Court's Bid Procedures Order will be filed in advance of the Sale Hearing to demonstrate that all creditors and other parties-in-interest were afforded proper notice.

**G.      Waiver of Federal Rule of Bankruptcy Procedure 6004(h)**

87.     As a final matter, the Debtor requests that the stay imposed by Federal Rule of Bankruptcy Procedure 6004(h) upon orders authorizing the use, sale or lease of property, be waived under the circumstances of these cases.  It is in the interest of the Debtor's creditors and estate that the Sale be consummated as quickly as possible without any stay pending appeal in light of Debtor's financial condition.  A delay of the Closing of the Sale may severely hinder the Debtor's operations and reduce its value to the detriment of the estate.  On the other hand, expedited consummation of the Sale will preserve the maximum going concern value for the Purchased Assets and will eliminate the Debtor's ongoing operational costs to the benefit of the estate.

88.     The Debtor will notice the hearing on this Sale Motion to all of its creditors and other parties-in-interest, and therefore any person having any objection to the Sale Motion will be afforded a reasonable opportunity to voice any objections or concerns.  Accordingly, the Debtor is aware of no prejudice that would be caused by the Court's waiver of Federal Rule of Bankruptcy Procedure 6004(h)

**WHEREFORE**, the Debtor respectfully requests that the Court enter its order as follows:

1.     Subject to any limitations or modifications contained in the Court's order, without need for any further Court order, (a) granting the Sale Motion and approving the Purchase Agreement and the transactions contemplated thereby; (b) authorizing the Debtor to consummate and carry out the transactions described in this Sale Motion and the Purchase Agreement, and to

undertake the obligations and other matters imposed, required or provided for therein such that, among other things, the Debtor, subject thereto, may sell assets, and grant or exchange releases as provided for in the Sale Motion or the Purchase Agreement or required thereby;

2.     Under Section 363(f) and without further order of the Court, approving the Sale of the Purchased Assets to Renwood or the Successful Purchaser free and clear of all liens, claims, encumbrances and interests, other than the Permitted Liens as provided in the Purchase Agreement, with any such liens, claims, encumbrances or interests not satisfied prior to or concurrently with the Closing attaching to the portion of the Debtor's proceeds of the Sale allocable to the property which was subject to the particular encumbrance in the same order and priority as such lien, claim, encumbrance or interest had as of the Closing;

3.     Determining that Renwood or the Successful Purchaser is a good faith purchaser of the Debtor's Purchased Assets such that 11 U.S.C. § 363(m) will be applicable in the event of a Closing;

4.     Finding that the terms of the Sale are fair and reasonable, and that Renwood or the Successful Purchaser is paying reasonably equivalent value for the Purchased Assets;

5.     Waiving the stay imposed by Federal Rule of Bankruptcy Procedure 6004(h) and authorizing the parties to hold the Closing immediately;

6.     Upon the Closing, authorizing Andronico's to change its name to "AMI Liquidating, Inc." and to file all documents as are necessary to reflect such name change;

7.     Upon the Closing, authorizing that all pleadings be filed and docketed under the Debtor's new name "AMI Liquidating, Inc." and be consistent with the proposed form of caption attached as Exhibit "C" to the Kaelin Declaration;

8.     Approving the sale and transfer of the California Department of Alcoholic Beverage Control liquor licenses issued to Debtor to Renwood or the Successful Purchaser and authorizing Debtor to complete the necessary transfer forms to effectuate the transfers, as contemplated by the Purchase Agreement; and

/ / /

/ / /

Case 11-48963    Doc# 184    Filed: 09/20/11    Entered: 09/20/11 19:05:30    Page 37 of 38

1    9.     For such other and further relief as the Court deems appropriate.

2    Dated:  September 20, 2011                    **MURRAY & MURRAY**
                                                   A Professional Corporation

3

4                                          By:   */s/ Doris A. Kaelin*
                                                  Doris A. Kaelin
5                                                 Attorneys for Debtor

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28