JOHN WALSHE MURRAY (074823)
DORIS A. KAELIN (162069)
THOMAS T. HWANG (218678)
MURRAY & MURRAY
A Professional Corporation
19400 Stevens Creek Blvd., Suite 200
Cupertino, CA 95014-2548
Telephone: (650) 852-9000; (408) 907-9200
Facsimile: (650) 852-9244
Email: jwmurray@murraylaw.com
Email: dkaelin@murraylaw.com
Email: thwang@murraylaw.com

Attorneys for Debtor

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA
# OAKLAND DIVISION

In re:

**ANDRONICO'S MARKETS, INC.,**
A California Corporation, aka
Andronico's Community Markets,

Debtor.

1200 Irving Street
San Francisco, CA 94122

Employer Tax I.D. No.: 94-1307395

Case No. 11-48963-EDJ-11

Chapter 11

Date: October 13, 2011
Time: 9:00 a.m.
Place: United States Bankruptcy Court
1300 Clay Street, Courtroom 215
Oakland, CA 94612
Judge: Honorable Edward D. Jellen

**EXHIBIT "A"**

**TO**

**DECLARATION OF WILLIAM J. ANDRONICO IN SUPPORT OF MOTION BY DEBTOR TO SELL CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS**

ASSET PURCHASE AGREEMENT

BY AND BETWEEN

ANDRONICO'S MARKETS, INC.
AS SELLER

AND

RENWOOD ANDRONICO LENDING 1, LLC

AS PURCHASER

SEPTEMBER 16, 2011

## TABLE OF CONTENTS

|   |   |   | Page |
|---|---|---|---|
| 1. | DEFINITIONS | | 1 |
|   | 1.1 | Definitions | 1 |
|   | 1.2 | Terms Defined Elsewhere in this Agreement | 8 |
|   | 1.3 | Other Definitional and Interpretive Matters | 8 |
| 2. | PURCHASE AND SALE | | 9 |
|   | 2.1 | Purchase and Sale | 9 |
|   | 2.2 | Assumed Liabilities | 9 |
|   | 2.3 | Excluded Liabilities | 10 |
|   | 2.4 | Assignment of Contracts and Rights | 10 |
|   | 2.5 | Purchase Price; Allocation of Purchase Price | 11 |
|   | 2.6 | Closing | 12 |
|   | 2.7 | Deliveries by Seller | 12 |
|   | 2.8 | Deliveries by Purchaser | 12 |
| 3. | REPRESENTATIONS AND WARRANTIES OF SELLER | | 12 |
|   | 3.1 | Organization | 13 |
|   | 3.2 | Governmental Authorization | 13 |
|   | 3.3 | Noncontravention | 13 |
|   | 3.4 | Required Consents | 13 |
|   | 3.5 | Litigation | 13 |
|   | 3.6 | Permits; Compliance with Laws and Court Orders | 13 |
|   | 3.7 | Sufficiency of and Title to the Purchased Assets | 14 |
|   | 3.8 | No Fees | 14 |
|   | 3.9 | Environmental | 14 |
|   | 3.10 | Insurance | 15 |
|   | 3.11 | Contracts | 15 |
|   | 3.12 | Subsidiaries | 15 |
|   | 3.13 | WARN Act Compliance | 15 |
| 4. | REPRESENTATIONS AND WARRANTIES OF PURCHASER | | 15 |
|   | 4.1 | Organization | 15 |
|   | 4.2 | Authorization | 15 |
|   | 4.3 | Governmental Authorization | 15 |
|   | 4.4 | Noncontravention | 15 |
|   | 4.5 | Litigation | 16 |
|   | 4.6 | Certain Fees | 16 |

| | | | |
|---|---|---|---|
| 5. | | COVENANTS OF SELLER | 16 |
| | 5.1 | Conduct of the Business | 16 |
| | 5.2 | Actions Not to be Taken by Seller | 17 |
| | 5.3 | Notices of Certain Events | 17 |
| | 5.4 | Insurance | 18 |
| | 5.5 | Avoidance Actions | 18 |
| | 5.6 | Supplement to Schedules | 18 |
| 6. | | COVENANTS OF PURCHASER | 18 |
| | 6.1 | Confidentiality | 18 |
| | 6.2 | Access | 18 |
| | 6.3 | Insurance | 19 |
| 7. | | COVENANTS OF PURCHASER AND SELLER | 19 |
| | 7.1 | Efforts; Further Assurances | 19 |
| | 7.2 | Certain Filings; Consents | 19 |
| | 7.3 | Examinations and Investigations | 20 |
| | 7.4 | Negotiation With Others | 20 |
| | 7.5 | Public Announcements | 20 |
| | 7.6 | Bankruptcy Issues | 21 |
| | 7.7 | Efforts to Consummate | 21 |
| 8. | | TAX MATTERS | 21 |
| | 8.1 | Tax Cooperation | 21 |
| | 8.2 | Allocation of Sales/Transfer Taxes | 21 |
| | 8.3 | Income Tax Consequences; Pre-Closing Sales Tax | 21 |
| | 8.4 | Property Taxes | 21 |
| 9. | | EMPLOYEE MATTERS | 21 |
| | 9.1 | Employees and Offers of Employment | 21 |
| | 9.2 | Employee Records | 22 |
| 10. | | CLOSING CONDITIONS | 22 |
| | 10.1 | Conditions to Obligations of Purchaser and Seller | 22 |
| | 10.2 | Conditions to Obligations of Purchaser | 23 |
| | 10.3 | Conditions to Obligations of Seller | 23 |
| 11. | | SURVIVAL | 24 |
| 12. | | TERMINATION | 24 |

|  |  |  |  |
|---|---|---|---|
|  | 12.1 | Grounds for Termination | 24 |
|  | 12.2 | Effect of Termination | 25 |
|  | 12.3 | Expenses | 25 |
| 13. | MISCELLANEOUS | | 26 |
|  | 13.1 | Notices | 26 |
|  | 13.2 | Waivers | 26 |
|  | 13.3 | Successors and Assigns | 27 |
|  | 13.4 | Governing Law | 27 |
|  | 13.5 | Jurisdiction | 27 |
|  | 13.6 | Waiver of Jury Trial | 28 |
|  | 13.7 | Third Party Beneficiaries | 28 |
|  | 13.8 | Time is of the Essence | 28 |
|  | 13.9 | Severability | 28 |
|  | 13.10 | Entire Agreement; Amendments; Counterparts | 28 |

Exhibits
A – Sale Order
B – Assumption Order

Schedules
1 – Assumed Contracts
2.1(g) – Industrial Vehicles
2.2(b) – Assumed Licenses
3.2 – Government Consents
3.5 – Litigation
3.6 – Permits
3.8 – Fees
3.10 - Insurance

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT dated as of September 16, 2011 (this "Agreement") is entered into by and between **RENWOOD ANDRONICO LENDING 1, LLC**, a Delaware limited liability company ("Purchaser"), and **ANDRONICO'S MARKETS, INC.**, a California corporation ("Seller"). Purchaser and Seller are sometimes individually referred to in this Agreement as a "Party" and collectively as the "Parties."

## RECITALS:

WHEREAS, Seller operates a chain of grocery stores in Northern California (the "Business").

WHEREAS, Seller desires to sell, transfer, convey, assign and deliver the Purchased Assets (as defined below) and to assign the Assumed Liabilities (as defined below), and Purchaser desires to purchase, take delivery of, and assume such Purchased Assets and Assumed Liabilities, upon the terms and subject to the conditions set forth herein.

WHEREAS, on August 22, 2011 (the "Petition Date") Seller filed and commenced a voluntary Chapter 11 bankruptcy case (the "Bankruptcy Case") captioned *In re Andronico's Markets, Inc.* (Case No. 11-48963-EDJ-11), in the United States Bankruptcy Court for the Northern District of California, Oakland Division (the "Bankruptcy Court").

WHEREAS, the transactions contemplated by this Agreement (the "Transactions") will be consummated pursuant to a Sale Order and Assumption Order (as defined below) to be entered in the Bankruptcy Case under sections 363 and 365 and other applicable provisions of the Bankruptcy Code (as defined below), and the Transactions and this Agreement are subject to the approval of the Bankruptcy Court.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements, covenants, representations, warranties, and promises set forth herein, and in order to prescribe the terms and conditions of such purchase and sale, intending to be legally bound, the Parties agree as follows:

1. **Definitions.**

    **1.1** Definitions. Except as otherwise defined herein, the following terms, as used herein, have the following meanings:

    (a) "503(b)(9) Claims" means all claims for goods received by the Seller within 20 days before the Petition Date, which goods have been sold to the Seller in the ordinary course of such Seller's business, and which claims have been determined to be legally valid claims in accordance with the procedures approved by the Bankruptcy Court in that certain Order (I) Granting Administrative Expense Status to Seller's Undisputed Obligations to Vendors Arising From Post-Petition Delivery of Goods Ordered Prepetition and Authorizing Debtor to Pay Such Obligations in Ordinary Course of Business; (II) Authorizing Payment for Goods

Received Within Twenty Days of the Petition Date and Establishing Administrative Claims Bar Date for 503(b)(9) Claims; and (III) Authorizing Debtor to Pay Undisputed PACA Claims in the Ordinary Course of Business, entered on August 25, 2011 [Dkt. No.51].

(b) "Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such other Person.

(c) "Assumed Contract" means a Contract listed on Schedule 1.

(d) "Assumption Motion" means that certain motion seeking authorization for the assumption and assignment of unexpired leases and executory contracts in connection with the sale of the Seller's assets, including findings relating to the cure required to be paid in connection with such assumption and assignment and findings that adequate assurance of future performance has been provided.

(e) "Assumption Order" means that certain order approving the assumption and assignment of unexpired leases and executory contracts, in a form acceptable to Purchaser, including the amount of cure required to be paid in connection with such assumption and assignment and determining that adequate assurance of future performance has been provided.

(f) "Auction" means the auction for the Purchased Assets, which shall be held on October 13, 2011 at 9:00 a.m. at the Bankruptcy Court if the Debtor receives qualified bids as set forth in the Bid Procedures Order.

(g) "Avoidance Actions" means all avoidance claims arising under Chapter 5 of the Bankruptcy Code or otherwise and the proceeds thereof, of whatever kind or nature, and whether asserted or unasserted, other than any claims, if any, against Purchaser or any of its Affiliates or the Hired Employees.

(h) "Bankruptcy Code" means title 11 of the United States Code (11 U.S.C. §101 et seq.), as amended from time to time.

(i) "Bid Procedures" means those bid procedures approved by the Bid Procedures Order.

(j) "Bid Procedures Motion" means that certain motion seeking entry of an order approving certain bid procedures for the sale of Seller's assets, in a form reasonably satisfactory to Purchaser.

(k) "Bid Procedures Order" means that certain order approving the Bid Procedures Motion entered on September 8, 2011 [Dkt. 129], as amended in a form acceptable to Purchaser.

(l) "Break-Up Fee" means all amounts due to Purchaser, including the bid protections approved by the Bankruptcy Court in the Bid Procedures Order in the amount of $250,000.

(m) "Business Day" means a day other than Saturday, Sunday or other day on which commercial banks in California are authorized or required by law to close.

(n) "Carve-Out Account" means the bank account designated as the Carve-Out Account in the DIP Facility, which account shall be used solely for purposes of funding the Professional Carve-Out (as such term is defined in the DIP Facility).

(o) "Claim" means a "claim" as defined in section 101 of the Bankruptcy Code, including any claim of "successor liability" as provided in the Sale Order.

(p) "Closing Date" means the date of the Closing.

(q) "Code" means the Internal Revenue Code of 1986, as amended, and the regulations, rulings and other pronouncements issued by the IRS pursuant to the Internal Revenue Code.

(r) "Committee" means the official committee of unsecured creditors appointed in the Bankruptcy Case.

(s) "Confidentiality Agreement" means the Confidentiality Agreement dated February 10, 2011 between Seller and Renovo Capital, LLC.

(t) "Contaminant" means any pollutant, hazardous substance, radioactive substance, toxic substance, hazardous waste, medical waste, radioactive waste, special waste, petroleum or petroleum-derived substance or waste, asbestos, PCBs, mold, or any hazardous or toxic constituent thereof and includes, but is not limited to, any substance defined in or regulated under Environmental, Health or Safety Requirements of Law.

(u) "Contract" means any contract, indenture, note, bond, lease or other agreement.

(v) "Cure Costs" means any and all amounts required to be paid to cure any defaults which exist as of the Closing Date with respect to any of the Assumed Contracts, which amount is also listed on Schedule 1, as such amounts may be modified by the agreement of the Purchaser and the party thereto.

(w) "DIP Facility" means that certain Debtor in Possession Credit Agreement dated as of August 24, 2011 by and among the Seller and Purchaser.

(x) "DIP Lender" means Renwood Andronico Lending 1, LLC, the Purchaser hereunder.

(y) "DIP Order" means the final order of the Bankruptcy Court approving the DIP Facility entered on September 8, 2011 [Dkt. No. 128].

(z) "Employee Benefit Plan" means any employee benefit plan, program, policy, practice, contract, agreement, fund or other arrangement (including any "employee benefit plan," as defined in section 3(3) of ERISA) or any employment, consulting or personal

services contract, whether written or oral or funded or unfunded, (i) sponsored, maintained or contributed to by Seller or to which Seller is a party, (ii) covering or benefiting any current or former officer, employee, agent, director or independent contractor of Seller (or any dependent or beneficiary of any such individual), or (iii) with respect to which Seller has (or could have) any obligation or liability. Without limiting the generality of the foregoing, the term Employee Benefit Plan includes all employee welfare benefit plans within the meaning of Section 3(1) of ERISA and all employee pension benefit plans within the meaning of Section 3(2) of ERISA, including, without limitation, all employee welfare benefit plans and employee pension benefit plans set forth in the current collective bargaining agreement between the Seller and the United Food and Commercial Workers Union Local 5 and Local 648.

(aa)  "Employees" means those individuals who are employed by Seller in connection with the Business as of the Closing Date.

(bb)  "Environmental, Health or Safety Requirements of Law" means all foreign, federal, state and local laws, statutes, codes, ordinances, rules, regulations, EHS Permits, or orders relating to or addressing the environment, health or safety in effect at the time of the action or inaction at issue or such laws, statutes, codes, ordinances, rules regulations, EHS Permits, or order of retroactive application, including, but not limited to, any law, statute, code, ordinance, rule, regulation, EHS Permit or order relating to (i) the use, handling, release or disposal of any Contaminant or (ii) workplace or worker safety and health, as such requirements are promulgated by the specifically authorized Governmental Authority responsible for administering such requirements.

(cc)  "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations, rulings and other pronouncements issued thereunder.

(dd)  "Excluded Assets" means:

    (i)  all Avoidance Actions, subject to the provisions in Section 5.5;

    (ii)  the minute books and organizational documents of Seller;

    (iii)  all amounts in the Carve-Out Account, except amounts in excess of fees and expenses allowed in the Bankruptcy Case (whether before or after the Closing) of professionals retained by the Debtor whose fees are intended to be covered in whole or in part by deposits into the Carve-Out Account; provided that all amounts included in the budget approved by the DIP Order to be placed into the Carve-Out Account through November 19, 2011 shall have been pre-funded into the Carve-Out Account prior to Closing;

    (iv)  except as provided in Section 5.4, all insurance policies relating to the Business, including any directors and officers insurance policies; provided that, any split-life policies and any cash surrender value of such policy or any deposits provided in connection with any insurance policy are Purchased Assets and not Excluded Assets, except as may be provided herein;

    (v)  all rights of Seller arising under this Agreement or in connection

with the Transactions;

        (vi)    all prepaid expenses and deposits to the extent relating solely to the Excluded Assets;

        (vii)    assets held in trust for the benefit of Employees, such as assets held under any Employee Benefit Plan;

        (viii)    all rights of Seller under any executory Contract that is not an Assumed Contract; and

        (ix)    assets that Purchaser may designate from time to time prior to Closing to be an Excluded Asset (for which designated assets there shall be no reduction in the Purchase Price).

    (ee)    "Governmental Authority" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

    (ff)    "Hired Employees" means those employees of Seller that are hired and employed by Purchaser from and after the Closing Date.

    (gg)    "Initial Credit Bid Amount" has the meaning set forth in Section 2.5(c)(i).

    (hh)    "Intellectual Property Rights" means (i) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all U.S. and foreign patents (including continuations, continuations in part, reissues and re examinations thereof) and patent applications, patent disclosures and patent rights; (ii) all trade names, trademarks, service names, service marks, trade dress, logos, brand names, trade designs, corporate names, including "Andronico's," "Andronico's Community Market," "Andronico's Markets," and "Park & Shop," and all applications, registrations, and renewals in connection therewith, together with all translations, adaptations, derivations and combinations thereof, and including all goodwill associated therewith; (iii) all copyrightable works, all works of authorship, all copyrights, and all applications, registrations and renewals in connection therewith; (iv) all trade secrets and confidential business information (including ideas, research and development, discoveries, concepts, formulas, licenses, franchises, inventions, processes and designs (whether or not patentable or reduced to practice); know how, manufacturing and production processes, techniques, methods and procedures, and all other processes, techniques, methods and procedures, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals); (v) all certificates of public convenience and necessity; (vi) all layouts, processes, inventions, development tools and all documentation and media constituting, describing or relating to any of the foregoing, including manuals, memoranda and records; (vii) all computer software (including assemblers, applets, compilers, source code, object code, flow charts or diagrams, data (including image and sound data), design and development tools, library functions, user interfaces, databases, compilations and related documentation), Internet web sites, URL's and domain names, and applications and registrations in connection therewith; (viii) all other proprietary rights; (ix) all

copies and tangible embodiments thereof (in whatever form, format or medium, and however fixed); and (x) all other intangible assets, properties and rights.

(ii) "Inventory" means, with respect to Seller, all inventory, all consignment inventory, including raw materials, work-in-process, finished goods, goods in transit, supplies, packaging materials and labels wherever currently located relating to the Business, without taking into account any reserve.

(jj) "Knowledge of Seller" "Knowledge of Seller" or any other similar knowledge qualification in this Agreement means all facts actually known by (i) William R. Brinkman of Bailey, Elizondo & Brinkman, LLC or (ii) William J. Andronico.

(kk) "Law" means any federal, state, local, municipal or foreign law, statute, code, ordinance, rule or regulation or common law requirement.

(ll) "Lien" has the meaning set forth in section 101(37) of the Bankruptcy Code, including any statutory lien claims (including agricultural or nursery liens), encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust agreement, right of setoff, recoupment or warranty, transfer restriction under any shareholder or similar agreement or encumbrance or any other right of a third party in respect of an asset.

(mm) "Material Adverse Effect" means a material adverse change in or effect on the Business, the Purchased Assets or financial condition of the Business after the Petition Date, taken as a whole.

(nn) "Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Authority.

(oo) "Ordinary Course of Business" means the ordinary and usual course of normal day to day operations of the Business prior to the Petition Date.

(pp) "Outstanding Debt" means all amounts owed by Seller to Purchaser, whether due or outstanding under the Prepetition Facility and the DIP Facility, or otherwise.

(qq) "PACA Lien Claims" means all legally valid claims for payment by creditors of Seller pursuant to the Perishable Agriculture Commodities Act and which claims have been determined to be legally valid claims in accordance with the procedures approved by the Bankruptcy Court in that certain Order (I) Granting Administrative Expense Status to Debtor's Undisputed Obligations to Vendors Arising From Post-Petition Delivery of Goods Ordered Prepetition and Authorizing Debtor to Pay Such Obligations in Ordinary Course of Business; (II) Authorizing Payment for Goods Received Within Twenty Days of the Petition Date and Establishing Administrative Claims Bar Date for 503(b)(9) Claims; and (III) Authorizing Debtor to Pay Undisputed PACA Claims in the Ordinary Course of Business, entered on August 25, 2011 [Dkt. No. 51].

(rr) "Person" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

(ss) "Pre-Closing Tax Period" means (i) any Tax period ending on or before the Closing Date and (ii) with respect to a Tax period that commences before but ends after the Closing Date, the portion of such period up to and including the Closing Date.

(tt) "Prepetition Facility" means, collectively, the financing provided by the DIP Lender's predecessors to Seller before the Petition Date and all documentation entered into with or in favor of, the DIP Lender in connection therewith.

(uu) "Property Taxes" means all real property Taxes, personal property Taxes and similar ad valorem obligations levied with respect to the Purchased Assets for any Tax period.

(vv) "Purchased Assets" means all of Seller's property and rights in and to property, except Excluded Assets.

(ww) "Sale Motion" means a motion authorizing the sale of the Purchased Assets free and clear of liens, claims and encumbrances.

(xx) "Sale Order" means an Order entered by the Bankruptcy Court approving the sale of the Purchased Assets.

(yy) "Successful Purchaser" means the party or parties submitting the highest or otherwise best bid or combination of bids in accordance with the Bid Procedures and the Bid Procedures Order for approval by the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code.

(zz) "Tax" means (i) any and all federal, state, local and foreign taxes, assessments, and any other governmental charges, fees, duties or other like assessment or charges of any kind whatsoever (including withholding on amounts paid to or by any Person and taxes based upon or measured by gross receipts, income, profits, sales, use and occupation, and value added, ad valorem, transfer, franchise, withholding, payroll, recapture, employment, excise and property taxes), together with all interest, penalty, addition to tax or additional amount imposed by any Governmental Authority (a "Taxing Authority") responsible for the imposition of any such tax (domestic or foreign), (ii) any liability for the payment of any amounts of the type described in clause (i) as a result of being or ceasing to be a member of an affiliated, consolidated, combined or unitary group for any period (including, without limitation, any liability under Treasury Regulation section 1.15026 or any comparable provision of foreign, state or local law);or (iii) liability for the payment of any amounts of the type described in (i) or (ii) as a result of being party to any agreement or any express or implied obligation to indemnify any other Person or as a result of any obligations under any agreements or arrangements with any other Person with respect to such amounts.

(aaa) "Tax Reserve" means the tax reserve to be established from the proceeds of: (i) the cash deposit provided by DIP Lender supporting letter of credit numbers (a)

MB60513004, (b) MB60512993, and (c) MB60513003; and (ii) the cash surrender value of the New York Life Insurance whole life policy number 26422048 insuring Kermit D. Guthrie, which reserve shall be returned to Purchaser on the earlier to occur of (A) February 15, 2013 or (B) if there are any amounts remaining in the Tax Reserve after payment of all taxes as set forth in Section 8.3.

    **1.2**    <u>Terms Defined Elsewhere in this Agreement</u>. For purposes of this Agreement, the following terms have meanings set forth in the sections indicated:

| Term | Section |
|---|---|
| Assumed Liabilities | 2.2 |
| Bankruptcy Case | Recitals |
| Bankruptcy Court | Recitals |
| Business | Recitals |
| Closing | 2.6 |
| Excluded Liabilities | 2.3 |
| Parties | Intro |
| Party | Intro |
| Permitted Liens | 3.7 |
| Petition Date | Recitals |
| Purchase Price | 2.5(c) |
| Purchaser | Intro |
| RCRA | 3.9(b) |
| Required Consents | 3.4 |
| Required Permits | 3.6(a) |
| Seller | Intro |
| Transactions | Recitals |
| WARN Act | 3.13 |

    **1.3**    <u>Other Definitional and Interpretive Matters</u>. Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

    (a)    <u>Calculation of Time Period</u>. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

    (b)    <u>Dollars</u>. Any reference in this Agreement to $ shall mean U.S. dollars.

    (c)    <u>Exhibits/Schedules</u>. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement. Any Schedule that is referenced herein but is not attached hereto on the date of execution of this Agreement shall be prepared, delivered and attached to this Agreement prior to the Sale Hearing.

(d)     Gender and Number. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(e)     Headings. The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(f)     Herein. The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(g)     Including. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

**2.    Purchase and Sale.**

**2.1**    Purchase and Sale. Subject to the terms and conditions set forth in this Agreement, at the Closing, Seller agrees to sell, transfer and deliver to Purchaser, and Purchaser agrees to purchase, acquire and accept from Seller the Purchased Assets. The Purchased Assets shall be sold and purchased "AS IS, WHERE IS."

**2.2**    Assumed Liabilities. Upon the terms and subject to the conditions of this Agreement, Purchaser agrees, from and after the Closing Date, to assume, pay, perform and discharge, promptly when payment or performance is due or required, the following liabilities and obligations, and only the following liabilities and obligations, of Seller or the Business (the "Assumed Liabilities"):

(a)     all liabilities and obligations of Seller arising under the Assumed Contracts to the extent that such liabilities first accrue and arise on or after the Closing Date and all obligations in connection with the demonstration of adequate assurance of future performance required under section 365(b)(1)(C) of the Bankruptcy Code;

(b)     all liabilities of Seller arising under any conditional sales contract for any Purchased Asset;

(c)     all liabilities and obligations of Seller arising under transferable licenses, permits and governmental authorizations of Seller identified on Schedule 2.2(b) and Intellectual Property Rights first accruing from and after the Closing Date;

(d)     all liability for previously unpaid PACA Lien Claims from the operation of the Business;

(e)     all liability under outstanding gift certificates; and

(f) all liabilities first arising from the operation of the Business or the ownership of the Purchased Assets by Purchaser from and after the Petition Date to the extent not previously paid, including any previously unpaid 503(b)(9) Claims.

2.3 Excluded Liabilities. Purchaser shall not assume and shall be deemed not to have assumed, and none of the Purchased Assets shall be or become liable for or subject to, and Seller shall retain and be solely and exclusively liable with respect to any Claims and any other liabilities of Seller, whether known or unknown, whether absolute, contingent, liquidated, unliquidated, unaccrued, asserted, unasserted or otherwise, and whether related to the Business, the Purchased Assets, the Excluded Assets or otherwise, other than the Assumed Liabilities (collectively, the "Excluded Liabilities"), including without limitation:

(a) any Claims, liabilities or costs of the Seller incident to, arising out of or incurred with respect to this Agreement and the transactions contemplated hereby or the Excluded Assets;

(b) any Claims, liabilities or costs arising under any Contract that is not an Assumed Contract and expressly assumed by Purchaser pursuant to Section 2.2; provided, however, that Purchaser shall be responsible for the payments required by Section 2.4(b);

(c) any liabilities, obligations, debts or commitments of the Seller relating to any Environment, Health or Safety Requirements of Law;

(d) any and all liabilities of Seller under any collective bargaining agreements, including, without limitation, any funded or unfunded liabilities of the Seller under any employee health, welfare, sick leave or pension plan or declaration of trust set forth or referenced in the current collective bargaining agreement between the Seller and the United Food and Commercial Workers Union Local 5 or Local 648;

(e) all Taxes of Seller, except as otherwise provided in Section 8.2 and 8.4 of this Agreement; and

(f) The Sale Order shall provide that any obligee of any such Excluded Liability shall be permanently enjoined from commencing, continuing or otherwise pursuing or enforcing against the Purchased Assets or the Purchaser any Excluded Liabilities.

2.4 Assignment of Contracts and Rights.

(a) To the maximum extent permitted by the Bankruptcy Code, the Assumed Contracts and Intellectual Property Rights shall be assumed by Seller and assigned to Purchaser at the Closing pursuant to section 365 of the Bankruptcy Code. Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Purchased Asset or any right thereunder if an attempted assignment, without the consent of a third party or order of the Bankruptcy Court under section 365 of the Bankruptcy Code, would constitute a breach or in any way adversely affect the rights of Purchaser or Seller thereunder. If such consent is not obtained or such assignment is not attainable pursuant to

sections 105, 363 and/or 365 of the Bankruptcy Code, then such Purchased Assets shall not be transferred hereunder and the Closing shall proceed with respect to the remaining Purchased Assets.

(b) After the Closing, Purchaser shall be responsible for paying all post-Closing obligations owing under any unexpired leases and unexpired contracts and related carrying costs that are not included in the Assumed Contracts and that are identified in a schedule delivered to Seller no later than the Sale Hearing, until such time as any such lease is rejected; *provided, however*, that all such leases and contracts shall be either rejected or assumed no later than November 30, 2011.

2.5 Purchase Price; Allocation of Purchase Price.

(a) Seller hereby acknowledges, confirms and agrees that (i) it has incurred and will hereafter incur indebtedness under the DIP Facility, (ii) to the extent provided for in the DIP Order, the DIP Lender has and shall continue to have a valid, enforceable and perfected first-priority lien upon, and security interest in, the Purchased Assets granted to the DIP Lender in connection with the DIP Facility, to the extent that the Purchased Assets that are not subject to valid, perfected, enforceable and non-avoidable liens as of the Petition Date and a second priority lien to the extent that the Purchased Assets are subject to valid, perfected, enforceable and non-avoidable liens as of the Petition Date; (iii) the DIP Lender has and shall continue to have a valid, enforceable and perfected first-priority lien upon and security interest in the Purchased Assets granted to DIP Lender in connection with the Prepetition Facility, subject only to PACA Lien Claims, any Permitted Lien as provided for in the DIP Facility, or any superior security interests provided to DIP Lender under the DIP Order in connection with the DIP Facility, and (iv) all amounts owing under the Prepetition Facility and the DIP Facility are valid and unconditional obligations of Seller to DIP Lender and are due and owing without offset, defense or counterclaim of any kind, nature or description whatsoever and Seller hereby expressly waives any and all rights to contest and/or challenge in any manner whatsoever DIP Lender's perfected liens upon and security interests in the Purchased Assets.

(b) Purchaser shall have the right to credit bid up to the full amount of the Outstanding Debt payable to DIP Lender, in accordance with section 363(k) of the Bankruptcy Code. Further, nothing contained herein shall impair Purchaser's right to bid amounts in excess of the Outstanding Debt.

(c) Subject to Purchaser's right (but not obligation) to overbid at the Auction in accordance with the Bid Procedures Order, the purchase price for the Purchased Assets (the "Purchase Price") shall be:

    (i) An amount equal to $14,707,690 as of the date of this Agreement (the "Initial Credit Bid Amount"), which shall be satisfied in the form of a credit against Seller's obligations under the DIP Facility and Prepetition Facility in accordance with section 363(k) of the Bankruptcy Code; plus

    (ii) a cash payment required to pay the Cure Costs, estimated to be

$277,445; plus

        (iii)    assumption of the Assumed Liabilities, including the funding of certain administrative expenses as specified in this Agreement, estimated to be $1,014,865.

The parties agree that the Purchase Price as of the date of this Agreement is estimated to be $16,000,000.

    (d)    Purchaser shall provide Seller with an allocation in accordance with section 1060 of the Code and the regulations thereunder within 120 days following the Closing.

    (e)    In the event that Purchaser (i) is the Successful Purchaser (defined below) and (ii) has not otherwise credit bid all amounts currently due and owing to it, Purchaser shall be deemed to have waived any and all other Claims it may have against the Seller's estate and in consideration for such waiver, Seller shall be deemed to have waived any and all Claims that it may have against Purchaser or any of Purchaser's Affiliates, whether known or unknown, contingent, liquidated, unliquidated, or otherwise.

**2.6**    Closing. The closing (the "Closing") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities shall take place at the offices of Perkins Coie LLP, 3150 Porter Drive, Palo Alto, California, 94304, no later than three (3) Business Days after satisfaction of the conditions set forth in Section 10 (other than those requiring a delivery, or the taking of other action, at the Closing), but in any event no later than October 21, 2011 (or October 31, 2011 in accordance with the provisions of the Bid Procedures Order) or at such other time or place as Purchaser and Seller may agree.

**2.7**    Deliveries by Seller. At the Closing, Seller will deliver or cause to be delivered to Purchaser (unless delivered previously) all other documents, certificates, instruments or writings reasonably requested by Purchaser in connection herewith, necessary to transfer the Purchased Assets to Purchaser; provided, however, that such documents, certificates, instrument or writings shall be consistent with the provisions of Section 11.

**2.8**    Deliveries by Purchaser. At the Closing, Purchaser will deliver or cause to be delivered to Seller the cash portion, if any, of the Purchase Price in immediately available funds, and all documents, certificates, instruments or writings reasonably requested by Seller in connection herewith (including all documents necessary (i) to release any Liens held by Purchaser in the Excluded Assets, (ii) to transfer the Assumed Contracts to Purchaser, and (iii) for Purchaser to assume the Assumed Liabilities). Purchaser will also deliver or cause to be delivered all Cure Costs to the party to the Assumed Contract entitled to payment of such Cure Costs.

**3.**    **Representations and Warranties of Seller.**

Subject to the terms, conditions and limitations set forth in this Agreement, and notwithstanding section 2.1, Seller hereby represents and warrants to Purchaser as of the date hereof as follows:

Case: 11-48963    Doc# 184-2    Filed: 09/20/11    Entered: 09/20/11 19:05:30    Page 17 of 18

**3.1** Organization. Seller is a corporation validly existing and in good standing under the laws of the State of California, and subject to the limitations imposed on Seller as a result of having filed a petition for relief under the Bankruptcy Code, has the requisite power and authority to own, lease and operate the Purchased Assets, and to carry on in all material respects the Business as now being conducted. Seller is duly qualified and is in good standing in each jurisdiction in which the ownership or lease of Purchased Assets or the conduct of the Business requires such qualification, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

**3.2** Governmental Authorization. To the Knowledge of Seller, after consultation with corporate counsel, other than approval of the Bankruptcy Court, the execution, delivery and performance by Seller of this Agreement and the consummation of the Transactions by Seller does not require Seller to make any filing with, or to obtain any permit, authorization, license, consent or approval of, any Governmental Authority, except as set forth on Schedule 3.2 or where the failure to so make or obtain would not have a Material Adverse Effect.

**3.3** Noncontravention. Subject to entry by the Bankruptcy Court of the Sale Order in the Bankruptcy Case, the execution, delivery and performance by Seller of this Agreement and the consummation of the Transactions does not and will not (i) violate Seller's articles or certificate of incorporation, as amended, or bylaws, (ii) assuming compliance with the matters referred to in Section 3.2, violate any Laws or Orders, (iii) except as to matters which would not reasonably be expected to have a Material Adverse Effect, constitute a default under or give rise to any right of termination, cancellation or acceleration of any right or obligation or to a loss of any benefit relating to any Purchased Asset to which Seller is entitled under any provision of any agreement or other instrument binding upon Seller except for breaches and defaults referred to in section 365(b)(2) of the Bankruptcy Code, or (iv) result in the creation or imposition of any Lien on any Purchased Asset, except for Permitted Liens.

**3.4** Required Consents. To the Knowledge of Seller, after consultation with corporate counsel, except for consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court in connection with the Sale Order or the Assumption Order (the "Required Consents"), there is no agreement or other instrument binding upon Seller requiring a consent, approval or action by any Person as a result of the execution, delivery and performance of this Agreement, except such consents or actions as would not, individually or in the aggregate, have a Material Adverse Effect if not received or taken by the Closing Date, except as set forth on Schedule 3.4.

**3.5** Litigation. As of the date hereof, there is no action, suit, investigation or proceeding pending against, or to the Knowledge of Seller, threatened against or affecting, Seller or the Purchased Assets before any court or arbitrator or any Governmental Authority which is reasonably likely to have a Material Adverse Effect or which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions, except as set forth on Schedule 3.5.

**3.6** Permits; Compliance with Laws and Court Orders.

(a) To the Knowledge of Seller, after consultation with corporate counsel, Schedule 3.6 sets forth a list of all material permits, governmental licenses, orders, registrations,